UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| CITGO PETROLEUM CORPORATION,<br>　　　　　Plaintiff, | Case No. 1:21-cv-00389-GHW |
| -against- | **SECOND AMENDED**<br>**COMPLAINT**[1] |
| ASCOT UNDERWRITING LIMITED (FOR AND<br>ON BEHALF OF THE MEMBERS OF LLOYD'S<br>SYNDICATE 1414), PIONEER UNDERWRITING<br>LIMITED (FOR AND ON BEHALF OF THE<br>MEMBERS OF CONSORTIUM NO. 9146),<br>MS AMLIN UNDERWRITING LIMITED (FOR AND<br>ON BEHALF OF THE MEMBERS OF LLOYD'S<br>SYNDICATE 2001), TRAVELERS SYNDICATE<br>MANAGEMENT LIMITED (FOR AND ON BEHALF<br>OF THE MEMBERS OF LLOYD'S SYNDICATE<br>5000), BRIT SYNDICATES LIMITED (FOR AND<br>ON BEHALF OF THE MEMBERS OF LLOYD'S<br>SYNDICATE 2987), SOMPO INTERNATIONAL<br>INSURANCE (FOR AND ON BEHALF OF THE<br>MEMBERS OF LLOYD'S SYNDICATE 5151),<br>CHAUCER SYNDICATES LIMITED (FOR AND ON<br>BEHALF OF THE MEMBERS OF LLOYD'S<br>SYNDICATE 1084), MARKEL SYNDICATE<br>MANAGEMENT LIMITED (FOR AND ON BEHALF<br>OF THE MEMBERS OF LLOYD'S SYNDICATE<br>3000), NEON UNDERWRITING LIMITED (FOR<br>AND ON BEHALF OF THE MEMBERS OF<br>LLOYD'S SYNDICATE 2468), and STARSTONE<br>INSURANCE SE, | Jury Demand |
| 　　　　　Defendants. | |

-------------------------------------------------------------------x

Plaintiff CITGO Petroleum Corporation ("CITGO"), for its Second Amended Complaint

against Defendants Ascot Underwriting Limited (for and on behalf of the members of Lloyd's

Syndicate 1414), Pioneer Underwriting Limited (for and on behalf of the members of Lloyd's

---

[1]　In accordance with Federal Rule of Civil Procedure 15(a)(2), CITGO obtained the written consent of all parties to
the filing of this Second Amended Complaint.

Consortium No. 9146), MS Amlin Underwriting Limited (for and on behalf of the members of Lloyd's Syndicate 2001), Travelers Syndicate Management Limited (for and on behalf of the members of Lloyd's Syndicate 5000), Brit Syndicates Limited (for and on behalf of the members of Lloyd's Syndicate 2987), Sompo International Insurance (for and on behalf of the members of Lloyd's Syndicate 5151), Chaucer Syndicates Limited (for and on behalf of the members of Lloyd's Syndicate 1084), Markel Syndicate Management Limited (for and on behalf of the members of Lloyd's Syndicate 3000), Neon Underwriting Limited (for and on behalf of the members of Lloyd's Syndicate 2468) (which members are, collectively, "Lloyd's Underwriters"), and Starstone Insurance SE (together with Lloyd's Underwriters, "Underwriters" or "Defendants"), states as follows.

## NATURE OF THE ACTION

1.      This is an action for breach of Marine Cargo Reinsurance Policy No. B1263EG0466118 underwritten by the Defendants ("the Policy").

2.      The Policy insured against, *inter alia*, the risk of loss of certain cargo aboard an oil tanker known as the M/T Gerd Knutsen (the "Gerd" or "Vessel").

3.      On February 9, 2020, the Gerd was anchored off the coast of Venezuela, awaiting leave to sail to its port of destination in Aruba.  The Gerd's cargo at that time consisted of 939,000 barrels of Diluted Crude Oil and 22,000 barrels of Pedernales crude oil ("the Cargo"), all of which belonged to CITGO.

4.      Also on February 9, 2020, Venezuelan actors – acting under the direction of purported authorities who were seeking to displace the duly constituted government of Venezuela, and in furtherance of that act of insurrection – approached the Gerd under show of arms and ordered the Gerd to sail to a Venezuelan port.

5.      The Vessel's master protested but complied.  When the Vessel reached port, the cargo was seized, transferred to another ship, and was completely lost to CITGO.

6.      CITGO promptly served upon Underwriters a notice of actual loss under the Policy, but Underwriters denied CITGO's claim in a letter dated March 18, 2020.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1332(a)(2) because CITGO is a citizen of Texas and Delaware, Defendants are citizens of the United Kingdom or Liechtenstein, and the amount in controversy exceeds $75,000.

8.      Venue is proper under 28 U.S.C. 1391(b)(3) because the parties entered a contract consenting to venue and personal jurisdiction in this Court.

## PARTIES

9.      Plaintiff CITGO Petroleum Corporation ("CITGO") is a Delaware corporation with its principal place of business in Houston, Texas.  CITGO is the original insured and the real party in interest under the Policy, although two non-parties were also involved in the insurance relationship at issue here.  CITGO received direct insurance from its captive insurer, Illuminant Insurance Company ("Illuminant").  Illuminant reinsured 100 percent of the insured risk with another CITGO captive insurer, Trimark Insurance Company, Ltd.  Trimark, in turn, ceded 100 percent of the reinsured risk to the defendant Underwriters.

10.      CITGO and the Underwriters have agreed in a written contract (the "Claims Presentation Agreement") that CITGO, as the real party in interest and ultimate recipient of any insurance proceeds under the Policy, may pursue the insurance claims described herein directly against Underwriters, without the participation of Illuminant and Trimark.  Also in the Claims Presentation Agreement, CITGO and Underwriters amended the Policy to include a cut-through

provision in favor of CITGO, which permits CITGO to pursue the claims at issue here directly against Underwriters.

11.     The Lloyd's Underwriters Defendants are members of certain unincorporated syndicates whose principal place of business is London, England.  Lloyd's Underwriters severally subscribed to the Policy as retrocessionaires (*i.e.*, the ultimate reinsurers) of the CITGO risk reinsured by Trimark and directly insured by Illuminant.  These defendants include:

    a.  Lloyd's Syndicate 1414 (sued through its Managing General Agent, Ascot Underwriting Limited).  The sole member of Lloyd's Syndicate 1414 is Ascot Corporate Name Limited.  Ascot Corporate Name Limited is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

    b.  Consortium No. 9146 (sued through its Managing General Agent, Pioneer Underwriting Limited).  Lloyd's Consortium 9146 is comprised of Lloyd's Syndicate 1980 and Lloyd's Syndicate 2088.  Lloyd's Syndicate 1980's sole member is Liberty Corporate Capital Limited.  Lloyd's Syndicate 2088's sole member is China Re UK Limited.  Liberty Corporate Capital Limited and China Re UK Limited are both corporations organized and existing under the laws of the United Kingdom, with their principal place of business in London, England.

    c.  Lloyd's Syndicate 2001 (sued through its Managing General Agent, MS Amlin Underwriting Limited).  The sole member of Lloyd's Syndicate 2001 is MS Amblin Corporate Member Limited.  MS Amlin Corporate Member Limited is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

d.  Lloyd's Syndicate 5000) (sued through its Managing General Agent, Travelers Syndicate Management Limited).  The sole members of Lloyd's Syndicate 5000 are AprilGrange UK Ltd and F&G UK Underwriters Ltd.  AprilGrange UK Ltd and F&G UK Underwriters Ltd. are both corporations organized and existing under the laws of the United Kingdom, with their principal place of business in London, England.

e.  Lloyd's Syndicate 2987 (sued through its Managing General Agent, Brit Syndicates Limited).  The sole member of Lloyd's Syndicate 2987 is Brit UW Limited.  Brit UW Limited is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

f.  Lloyd's Syndicate 5151 (sued through its Managing General Agent, Sompo International Insurance).  The sole member of Lloyd's Syndicate 5151 is Endurance Corporate Capital Limited.  Endurance Corporate Capital Limited is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

g.  Lloyd's Syndicate 1084 (sued through its Managing General Agent, Chaucer Syndicates Limited).  The sole member of Lloyd's Syndicate 1084 is Chaucer Corporate Capital (No 3) Limited.  Chaucer Corporate Capital (No 3) Limited is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

h.  Lloyd's Syndicate 3000 (sued through its Managing General Agent, Markel Syndicate Management Limited).  The sole member of Lloyd's Syndicate 3000 is Markel Capital Limited.  Markel Capital Limited is a corporation organized and

existing under the laws of the United Kingdom, with its principal place of business in London, England.),

i.   Lloyd's Syndicate 2468 (sued through its Managing General Agent, Neon Underwriting Limited).  The sole members of Lloyd's Syndicate 2468 are Sampford Underwriting Limited, Lavenham Underwriting Limited and GAI Indemnity, Ltd.  Sampford Underwriting Limited, Lavenham Underwriting Limited and GAI Indemnity, Ltd are all corporations organized and existing under the laws of the United Kingdom, with their principal place of business in London, England.

12.   Defendant Starstone Insurance SE ("Starstone") is a Liechtensteiner corporation with its principal place of business in Schaan, Liechtenstein.  Starstone subscribed to the Policy and therefore is among the ultimate reinsurers of the marine cargo risk that is the subject of this Second Amended Complaint.

**FACTS**

**I.    The Policy**

13.   The Underwriters issued Marine Cargo Reinsurance Policy No. B1263EG0466118, for the policy period of June 1, 2018 to June 1, 2019.

14.   The Policy lists CITGO as the original insured; Illuminant as the Reinsured; and non-party PDV Insurance Company Limited ("PDVIC") – Bermuda, as the retrocedent.

15.   By Deed of Novation executed in February 2018 by and among PDVIC, Plaintiff, Illuminant, and Defendants, PDVIC assigned to Plaintiff Trimark all of PDVIC's rights and obligations under the Policy.

16.   By Claim Presentation Agreement dated December 21, 2020, CITGO and Underwriters agreed that CITGO may pursue directly against Underwriters CITGO's insurance

claims for loss of the Cargo, without the participation of Trimark and Illuminant, as though Underwriters were in direct contractual privity with CITGO under the Policy.

17.     The Policy covers the risk of damage to or loss of "Goods and/or Merchandise of every description," with a limit of liability of "USD 100,000,000 any one Vessel and/or Aircraft and/or Conveyance and/or any one loss at any one Location."

18.     Coverage under the Policy attaches to cargo "from the time the [cargo] becomes at the Assured's risk … and continues whilst the subject matter is in transit and/or in store, including during delays within or beyond the Assured's control, … until finally delivered to [the] intended final destination …."

19.     The Policy includes several coverage forms that set forth the risks covered by the Policy, one of which is entitled the "Institute War Clauses (Cargo)."

20.     The Institute War Clauses (Cargo) state in pertinent part:

> 1.    *This insurance covers … loss of or damage to the subject matter insured caused by*
>
> > 1.1  *war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power*
> > 1.2  *capture seizure arrest restraint or detainment, arising from the risks covered under 1.1. above, and the consequences thereof or any attempt thereat*
>
> > \*\*\*
>
> 11.   *It is the duty of the Assured and their employees and agents in respect of loss recoverable hereunder*
>
> > 11.1 *to take such measures as may be reasonable for the purpose of averting or minimizing such loss, and*
> > 11.2 *to ensure that that all rights against carriers, bailees or other third parties are properly preserved and exercised.*
>
> *and the Insurers will, in addition to any loss recoverable hereunder, reimburse the Assured for any charges properly and legally incurred in pursuance of these duties.*

21.   The Policy also contains a "Forwarding Expenses Clause," which states in

pertinent part:

> *If owing to circumstances beyond the control of the Insured, an insured voyage is frustrated, interrupted or terminated for any reason whatsoever ... and the cargo insured hereunder is not delivered to the destination contemplated, this insurance is to continue ... whilst the insured cargo is held in storage (onboard vessel or otherwise) ...*
>
> *Insurers also to pay any additional charges and/or expenses and/or legal fees that are incidental to the release, storage and/or onward shipment of the insured cargo that are incurred by the Insured.*
>
> *Expenses recoverable under the above clause shall be in addition to any sue and labour or other expenses which may be recoverable elsewhere under this policy ....*

22.   The Policy also contains a "Sue and Labour" clause, which provides in pertinent

part:

> *In case of any imminent or actual loss or misfortune arising from a peril covered hereunder, it shall be lawful for the Assured ... to sue, labour and travel for, in and about the defence, safeguard and recovery of the [cargo], or any part thereof without prejudice to this policy.  Insurers to bear the costs of the Assured's actions in this respect....*

23.   The Policy also contains a "Demurrage/Late Return Charges" clause, which

states:

> *If the Assured is required by the actions of the underwriters or their agents or Surveyors to hold onto any property leased or hired by the Assured for the carriage or the storage of the subject matter insured hereunder and if the Assured is assessed a late return penalty and/or demurrage charge for holding said property passed* [sic] *the due return date, these underwriters will pay the late return penalties and/or demurrage charges as a consequence of such late return.*
>
> *The amount these underwriters will pay shall be the charges assessed from the time the Assured is required to hold said property until the time the Assured is informed that the property can be released.  Coverage under this clause is separate from and in addition to the limits of liability provided elsewhere herein.*

24.     Finally, regarding choice of law and choice of forum, the main body of the Policy states that New York law governs the Policy and that "each party agrees to submit to the exclusive jurisdiction of the Courts of the State of New York, United States of America."

25.     By the subsequent Claim Presentation Agreement dated December 21, 2020, CITGO and Underwriters agreed to make this Court the sole and exclusive forum for CITGO's claims under the Policy related to the Cargo.

## II.     The Gerd Receives the Cargo, But Does Not Receive Clearance to Sail

26.     CITGO chartered the Gerd from Knutsen Shuttletanker Pool AS ("Knutsen") to carry a cargo consisting of 939,000 barrels of Diluted Crude Oil ("DCO") and 22,000 barrels of Pedernales crude oil.

27.     Under the terms of an underlying agreement with Venezuelan company Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA transferred the Cargo to CITGO as a swap for refined product that CITGO duly delivered to PDVSA, pursuant to which the Cargo was delivered free on board and became CITGO's property upon passing the ship's flange.

28.     PDVSA, a Venezuelan state-owned petroleum company, is the indirect parent company of CITGO.  The two companies had frequent business dealings with one another until the United States government implemented sanctions against PDVSA.

29.     Loading of the Cargo onto the Gerd commenced on January 20, 2019 and was complete as of January 27, 2019.

30.     On or about January 30, 2019, CITGO instructed the Vessel's master to depart Venezuelan waters and sail for Aruba, where the DCO was to be delivered.

31.     Before the Gerd could sail, it first was required to request leave from the harbor master, receive customs clearance from SENIAT (the customs and revenue service of Venezuela),

and receive an underwater hull inspection from the Bolivarian National Guard of Venezuela. The Vessel's master duly requested each of these clearances, but he received no response.

32.     For more than twelve months, the Gerd remained anchored off the Venezuelan coast, repeatedly seeking the necessary clearances to depart and always receiving no response.

33.     As detailed below, this lack of response from Venezuelan authorities – and the ultimate seizure of the Gerd's Cargo – arose directly from an insurrection in Venezuela against its legitimate president and internationally recognized government.

### III.     Nicolás Maduro Asserts Victory in an Illegitimate Election; Juan Guaidó Assumes the Venezuelan Presidency, and the United States Recognizes the Guaidó Government

34.     In 2012, Hugo Chávez was elected to a six-year term as president of Venezuela. After Chávez's death in March 2013, his vice president, Nicolás Maduro, assumed power as interim president. Maduro was subsequently elected in April 2013 to serve out the remainder of Chávez's term.

35.     During Maduro's term in office, Venezuela spiraled downward, with the size of the economy shrinking by 50% between 2013 and 2018 and imports collapsing by 78% over the same period, resulting in hyperinflation and a significant shortage of food and medical supplies. Protests and civil insurrection ensued, followed by arrests.

36.     By late 2015, an opposition coalition had won control of Venezuela's legislature, the National Assembly.

37.     In May 2017, Maduro attempted to recapture legislative power by calling for a "National Constituent Assembly" under Article 347 of the Venezuelan Constitution. Members of the international community denounced the move as unconstitutional, and the opposition coalition boycotted the ensuing elections, which were marred by protests and violence.

38.     In its first month of existence, the Constituent Assembly gave itself the power to legislate, refused to subordinate itself to the National Assembly, and voted to put opposition leaders on trial for treason.

39.     In 2018, Maduro ran for re-election.  Although Maduro nominally received a majority vote, the election was rife with irregularities that undermined its legitimacy:  Maduro's government had banned the major opposition parties from participating, imprisoned political opponents, and engaged in widespread vote-buying.

40.     The National Assembly promptly declared Maduro's re-election illegitimate.

41.     Numerous Latin American countries also condemned Maduro's election meddling and responded by severing diplomatic ties with Maduro and declaring the election illegitimate.

42.     The United States announced it would not recognize the election's results.

43.     Maduro ignored his critics and proceeded to be sworn in for a second presidential term on January 10, 2019.  That same day, the Organization of American States – an organization of all 35 independent nations in North and South America – voted not to recognize Maduro as president.

44.     Under Article 233 of the Venezuelan constitution, a vacancy in the presidency shall be filled by the leader of the Venezuelan National Assembly until such time as elections may be held.

45.     In accordance with that constitutional mandate, the leader of the National Assembly, Juan Guaidó, agreed to act as interim president until free and fair elections could be held.

46.     On January 23, 2019, Guaidó took the oath of office and assumed the presidency.

47.     Fifty-five foreign governments, including the United States and the United Kingdom, recognized Guaidó as the lawful President of Venezuela.

48.     On the date of President Guaidó's inauguration, President Trump issued a press release stating: "I am officially recognizing … Juan Guaido[] as the Interim President of Venezuela. … We continue to hold the *illegitimate Maduro regime* directly responsible for any threats it may pose to the safety of the Venezuelan people."[2]

49.     The same day, the U.S. Department of State stated that it "stands with interim President Juan Guaido" and would "conduct [its] relations with Venezuela through the government of President Guaido."  The State Department further stated that it "does not consider *former president Nicolas Maduro* to have [] legal authority" as president.[3]

50.     Venezuela's National Assembly subsequently enacted resolutions declaring Maduro's mandate illegitimate and creating a framework for a transition government.

### IV.     Maduro Commandeers Military Power to Usurp the Legitimate Government of Venezuela in an Armed Insurrection

51.     After assuming power, President Guaidó attempted to bring humanitarian aid from neighboring countries to alleviate the crisis caused by Venezuela's crumbling economy.

52.     Former president Maduro, now legally a private citizen, responded by sending military troops loyal to his claim of authority to prevent aid from entering the country.  Violent standoffs ensued at the Colombian border crossing:  trucks full of supplies were set ablaze, and civil militias and military troops loyal to Maduro killed seven individuals and injured hundreds more.

---

[2]  https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/ (emphasis added).

[3]  https://2017-2021.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/index.html (emphasis added).

53.     On April 30, 2019, President Guaidó called on Venezuela's military to uphold the Venezuelan constitution and his own legitimate authority as president.  In the pro-Guaidó public demonstrations that followed, forces loyal to former president Maduro fired tear gas and rubber bullets into crowds of demonstrators, and at least one person was shot with live ammunition.  In one incident, armored vehicles plowed into a group of pro-Guaidó demonstrators.  Maduro loyalists also attacked journalists.

54.     On January 6, 2020, Maduro loyalists employed force in an attempt to seize control of the National Assembly, by physically blocking members of the majority party, including President Guaidó, from entering the legislative building, and then purporting to vote (in the absence of the majority party members) to elect a new National Assembly President from Maduro's party.

55.     The same day, the majority of the National Assembly reconvened elsewhere in the capital and voted to reelect Juan Guaidó interim president of Venezuela.

56.     To this day, a faction of Venezuelans continues to wield the threat of violence and force of arms to thwart the lawful orders and policy prerogatives of the Guaidó government.  As recently as December 6, 2020, Maduro held a sham election in an attempt to pack the National Assembly with Maduro loyalists.  Guaidó and his supporters boycotted the election, and the United States condemned the election as "fraudulent."

57.     As of the date of this Second Amended Complaint, the United States "continue[s] to recognize the legal authority of the democratically elected 2015 National Assembly and, of course, the person chosen by this National Assembly to be its president as the constitutional interim president of Venezuela is Juan Guaido."[4]

---

[4]  https://www.state.gov/briefings/department-press-briefing-march-12-2021.

### V.    Maduro Loyalists Cause the Gerd to Remain at Anchor for Over a Year, Then Eventually Seize the Cargo

58.    It was in this context that, on January 20, 2019, PDVSA began delivering the Cargo of crude oil to CITGO by loading it free on board the Gerd.  The transfer of the Cargo was completed on January 27, 2019.  In the intervening days, President Guaidó had assumed office.

59.    On January 28, 2019 – the day after loading of the Cargo was complete – the United States imposed sanctions on PDVSA that prohibited PDVSA from receiving the proceeds of Venezuelan oil sales in the U.S. and elsewhere, effectively freezing accounts payable to PDVSA.

60.    The intent of the sanctions, according to then-National Security Adviser John Bolton, was to stop Maduro and his allies from continuing to "loot the assets of the Venezuelan people."

61.     The United States offered to withdraw the sanctions if former president Maduro ceased his attempts to wrest power from Guaidó, but Maduro refused.

62.    It was on January 30, 2019, just two days after sanctions against PDVSA were implemented, that the Gerd first requested the necessary clearances to depart Venezuelan waters. The harbor master, SENIAT, and Bolivarian Coast Guard, who were subject to the power of military forces loyal to former president Maduro and his allies, failed to acknowledge and, indeed, entirely ignored those requests.

63.    When Venezuelan authorities failed to respond, CITGO instructed the Vessel nonetheless to comply with its charter and sail for Aruba.

64.    The ship's master refused CITGO's instruction, informing CITGO that the Vessel would not depart without the necessary clearances.

65.     On February 1, PDVSA representatives requested that the Gerd discharge its Cargo into PDVSA's custody, even though PDVSA had willingly conveyed the Cargo to CITGO in exchange for consideration beginning on January 20, 2019 and ending on January 27, 2019.

66.     The ship's master refused PDVSA's request to unload the Cargo, taking the position that his charter with CITGO did not permit him to accede to PDVSA's demands.

67.     A standoff thus commenced, which would continue for more than a year.  During that time, the Vessel's master repeatedly requested the necessary clearances to depart Venezuelan waters.  Those requests were uniformly ignored.  PDVSA, for its part, repeatedly requested that the ship's master surrender the Cargo.  The ship's master refused.

68.     On February 8, 2019, President Guaidó appointed a new *ad hoc* Managing Board of PDVSA.  The Managing Board effected the appointment of a new Board of Directors of PDVSA's wholly owned subsidiary, PDV Holding; PDV Holding took the same actions in respect of its subsidiary, CITGO Holding; and CITGO Holding followed the same process to appoint a new board of directors for Plaintiff CITGO Petroleum Corporation.

69.     After an ensuing power struggle and lawsuit between the legacy CITGO board of directors and the board appointed by President Guaidó, on August 21, 2019, the Delaware Chancery Court ruled that the board newly appointed by President Guaidó was the legitimate board and the only board authorized to act for CITGO.

70.     On or about August 30, 2019, the Procurador Especial (Special Attorney General) of Venezuela lawfully appointed by President Guaidó issued a directive stating that the Cargo belonged to CITGO and not PDVSA; ordering that the ship should be permitted to depart; directing the official instrumentalities of the Venezuelan government to facilitate that departure; and subjecting anyone who disregarded that directive to legal consequences.

15

71.     Notwithstanding the directive of the lawful Procurador Especial, the Venezuelan harbor master, SENIAT, and Bolivarian Coast Guard continued to ignore the Gerd's requests for clearance to sail.

72.     In or around September 2019, Knutsen (the Gerd's owner) informed CITGO that the Gerd was dangerously short of the bunker fuel, which was required to operate life support systems necessary to sustain a crew aboard the Vessel, that Knutsen had been unable to find any entity that was willing to rebunker the ship in Venezuelan waters, and that if the Vessel's bunkers were exhausted, the master would order the crew to abandon ship.

73.     CITGO then took independent action to attempt to rebunker the Gerd.  Because of U.S. sanctions, CITGO was required to obtain permission from the U.S. Office of Foreign Asset Control to rebunker the Gerd.

74.     CITGO ultimately received the permission it requested, found a company willing to take the risk of entering Venezuelan waters, and caused the Gerd to be resupplied on October 9, 2019, preventing the imminent abandonment of the Vessel by its crew and the total loss of the Cargo.

75.     On or about November 12, 2019, PDVSA – acting under illegitimate directors that had been replaced by the Guaidó government – caused a letter to be sent to the Gerd, purporting to assert PDVSA's right as "cargo owners" to instruct the ship's master to discharge the Cargo, after which the ship would purportedly be "able to sail safely up to [the] next port." The master refused.

76.     On or around November 29, 2019, another letter was sent, this time on PDVSA letterhead, claiming that the board of directors of CITGO had adopted and ratified a resolution directing the Gerd to deliver the Cargo to PDVSA.

77.     The letter's statement was false – the legitimate board of directors had adopted no such resolution – and the master once again refused to surrender the Cargo.

78.     CITGO sought emergency relief in the Delaware Chancery Court that had issued the August 21, 2019 order, whereupon the fraudulent letter was withdrawn.

79.     On December 17, 2019, the Chancery Court issued a further order, stating that the actions of the illegitimate directors were "blatantly inconsistent" with the court's prior order; ordering those directors not to "hold themselves out as directors" of CITGO; and ordering CITGO's legitimate board of directors to submit a copy of the December 17, 2019 order to the "captain of the Gerd Knutsen and the Harbor Master of the harbor where the Gerd Knutsen is stationed."

80.     On or about December 22, 2019, a purported PDVSA representative again attempted to obtain the cargo, this time by boarding the Vessel together with two members of the National Guard, and presenting the master with an order allegedly issued by a local Venezuelan court (not a maritime court) purporting to direct the master of the Vessel to sail to Puerto Jose Terminal and discharge the Cargo.  CITGO directed the Vessel's master not to comply with the directive, which CITGO believed to be illegitimate, and the Vessel remained at anchor.

81.     No further attempts were made to seize the Cargo for the next several weeks; however, on February 5, 2020 President Guaidó attended the State of the Union address in Washington, D.C., at the invitation of President Trump.

82.      In his speech, President Trump derided Maduro as an "illegitimate ruler, a tyrant who brutalizes his people," and vowed that "Maduro's grip on tyranny [would] be smashed." President Trump then acknowledged President Guiadó in the gallery, calling him "the true and legitimate president of Venezuela."

83.     Two days later, on February 7, 2020, a purported PDVSA representative, acting at the behest of Maduro, notified the master of the Gerd that it was to sail to Jose Terminal, in the vicinity of the Venezuelan port of Puerto la Cruz, for the purpose of discharging its Cargo to PDVSA, and that Venezuelan Coast Guard personnel would board the Vessel to ensure the Gerd complied.

84.     On Sunday, February 9, 2020, an armed Venezuelan vessel with mounted and manned guns approached the Gerd, followed by a second vessel that discharged personnel to board the Gerd to compel the master to carry out PDVSA's February 7, 2020 directive.

85.     The Gerd's master issued a formal letter of protest, but to protect the life and safety of his ship and crew, sailed the Vessel into port with Venezuelan personnel loyal to the unlawful Maduro regime on board, and under escort of the armed Venezuelan vessel.

86.     On or about February 11, 2020, the Gerd arrived at port, and the Cargo was removed from the Gerd and lost to CITGO.

## VI.     Plaintiff's Communications with Underwriters

87.     On July 22, 2019, Plaintiff provided notice of circumstances to the Underwriters, informing them of the Gerd's situation and of CITGO's ongoing efforts to secure the Cargo, and requesting reimbursement for amounts expended by CITGO in its attempts to prevent the loss of the Cargo and secure its conveyance to Aruba.

88.     On September 6, 2019, CITGO sent another letter to the Underwriters, updating them regarding the status of the Gerd and CITGO's continued efforts to prevent the loss of the Cargo and secure its conveyance to Aruba.  CITGO noted that if its continuing efforts were not successful, and considering that the Cargo had been stranded for nearly 9 months with no end in sight, CITGO would have no choice but to abandon the Cargo and declare a Constructive Total

Loss.  CITGO once again requested confirmation that the Underwriters would reimburse CITGO for the costs and expenses it was incurring in its efforts to protect the Cargo.

89.     On September 10, 2019, the Underwriters responded to CITGO's July 22, 2019 notice.  The Underwriters took the position that CITGO's ongoing costs arising from its efforts to preserve and compel conveyance of the Cargo were not compensable under the Policy; that abandonment of the Cargo would not be "reasonable" under the circumstances and would not constitute a covered Constructive Total Loss; and that any ultimate loss of the Cargo under the circumstances would not be covered by the Policy, because the Policy excluded losses caused by "restraint or detainment."

90.     On September 19, 2019, CITGO replied, contesting Underwriters' coverage position and informing them that the Gerd was running short of fuel, and the ship's crew would be left with no choice but to abandon ship when that happened, all of which would result in the Cargo being lost to CITGO.  CITGO explained the difficulties imposed by the sanctions regime and the lack of third parties willing and able to resupply the Vessel.

91.     On October 1, 2019, CITGO informed the Underwriters that the Vessel likely would run out of fuel on October 4, 2019, and CITGO conveyed that the Vessel's master had written: "We are considering all options, but the reality is that without bunkers the crew will at some point need to abandon the vessel."

92.     The Underwriters responded in an October 7, 2019 letter, questioning "how a lack of fuel … would create a need for the crew to abandon the Vessel," and "why fuel (and food, water and other deliverables necessary for the crew to remain aboard the Vessel) cannot be delivered to the Vessel."  Underwriters claimed that CITGO would not be justified in abandoning the Cargo "[e]ven if Knutsen (or the Vessel's crew) were to abandon the vessel," and they

"remind[ed] CITGO … of its duty to act as a prudent insured, and to take all necessary steps to preserve the cargo from loss or damage."  In this regard, Underwriters argued that CITGO's "focus should be on obtaining the port and customs clearances and underwater hull inspection that are said to be obstacles to the Vessel's permission to sail."  Underwriters maintained their position that they had no responsibility for CITGO's ongoing expenses, any demurrage costs, or for any eventual loss of the Cargo as a result of the Gerd's situation.

93.    In an October 25, 2019 letter, CITGO provided a further update to the Underwriters.  In that letter, CITGO refuted the Underwriters' argument that coverage was excluded because the Vessel was subject to a "restraint" or "detainment."  CITGO noted, among other things, that the Institute War Clauses provide coverage for detainments arising from insurrection or civil strife, and that "[h]ere, two governments are laying claim to authority over the same state and one has maintained power only by deploying lethal force against a resistant population."

94.    In their November 15, 2019 response to CITGO's October 25, 2019 letter, the Underwriters disputed CITGO's "novel assertion" that the Institute War Clauses could provide coverage, calling the argument "wholly without merit."  Without citing any authority, the Underwriters declared that the Vessel's inability to depart Venezuelan waters "has nothing to do with 'insurrection,' 'civil strife,' or any other war risk," notwithstanding CITGO's "vague and unsupported intimations to the contrary."

95.    On January 17, 2020, the Underwriters sent another letter to CITGO, stating that "the Vessel's circumstances (and potential circumstances) are unchanged, and do not (and could not) give rise to a covered loss."

96.     On February 11, 2020, the Cargo was seized.  Two days later, CITGO sent to the Underwriters a Notice of Actual Loss, demanding coverage under the Institute War Clauses.

97.     On March 18, 2020, Underwriters denied CITGO's claim in a formal letter, arguing that the Maduro regime, "whatever its legitimacy may be," was not in "insurrection" against the Guaidó government; and that the seizure of CITGO's cargo arose from a commercial dispute between CITGO and PDVSA rather than the Maduro insurrection.

## VII.   CITGO's Damages

98.     During the prolonged standoff leading up to the seizure, CITGO undertook extraordinary measures to attempt to secure the cargo, at significant cost to CITGO.

99.     CITGO instituted arbitration proceedings with Knutsen as part of an attempt to compel the Gerd, consistent with its charter, to convey the cargo to safety in Aruba.  These efforts were unsuccessful.

100.    In that arbitration, Knutsen demanded that CITGO pay demurrage for the period from March 15, 2019 through February 27, 2020, including the unanticipated, lengthy period of time the ship lay at anchor while CITGO attempted to preserve the Cargo.  The arbitration was settled when CITGO made payment to Knutsen in exchange for a release of the claims for demurrage.

101.    When the ship began to run out of bunker fuel, CITGO procured a sanctions exemption from the U.S. government and arranged to have the Gerd refueled at CITGO's expense.

102.    CITGO lobbied the Guaidó government to intervene and succeeded in procuring a directive from the lawful Procurador Especial of Venezuela directing that the Vessel be cleared and permitted to depart.

103.     These are just some of the efforts CITGO undertook to preserve and secure the Cargo and are not intended as an exclusive list.  All costs associated with these and CITGO's other efforts are recoverable from Underwriters under the Forwarding Expenses Clause, the Sue and Labour Clause, or both.

104.     In their correspondence with CITGO, the Underwriters have expressly denied liability under the Policy for these expenses under the Forwarding Expenses Clause or the Sue and Labour Clause.

105.     In addition, CITGO has been damaged by the Actual Loss of its Cargo, the value of which is over $40,000,000.

## CAUSE OF ACTION – BREACH OF CONTRACT

106.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

107.     The Policy is a valid, legally binding contract between Trimark and Defendants.

108.     Under the terms of the Claim Presentation Agreement entered into between CITGO and Underwriters, CITGO stands in the shoes of Trimark as respects the claims asserted in this Second Amended Complaint.

109.     The Policy provides reinsurance extending to the risk that the Gerd's Cargo would be lost by seizure, restraint, or detainment "arising from" war, civil war, revolution, rebellion, or insurrection, or civil strife arising from any of them.

110.     As insurrection is an attempt to overthrow a lawfully constituted government.

111.     The Gerd's Cargo was seized as a result of civil war, revolution, rebellion, insurrection, and/or civil strife arising therefrom, inasmuch as it was a consequence of the unlawful Maduro regime to overthrow and displace the lawfully constituted Guaidó government, and it was carried out by actors doing the bidding of the Maduro regime in disobedience to the authority and express directives of the Guaidó government.

112.    The Cargo's seizure constitutes an actual loss under the Policy, and the loss is entirely within the scope of the coverage afforded by the Policy.

113.    The Defendant Underwriters have breached the Policy by failing and refusing to cover, under the Forwarding Expenses Clause, Sue and Labour Clause, and Demurrage/Late Return Charges Clause, or otherwise, the expenses incurred by CITGO to sustain and rebunker the Gerd during the more than one year it lay in anchor in Venezuelan waters, as well as refusing to pay the expenses incurred by CITGO in its attempts to compel the Gerd to sail and compel Venezuelan actors to provide the requested clearances to sail.

114.    The Defendant Underwriters have breached the Policy by failing and refusing to cover the actual loss of the Cargo.

115.    The Defendant Underwriters' breaches described herein were material, were not excused or waived, and have damaged CITGO in an amount to be proven in these proceedings, anticipated to be more than $40,000,000.

116.    All conditions precedent for the bringing of this claim have been satisfied, excused, or waived.

### JURY DEMAND

CITGO demands a jury on all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that the Court:

i.      Grant judgment in favor of CITGO on its claim for Breach of Contract, and against each of the Defendants for same, severally according to their respective shares, in an amount to be the subject of proof;

    ii.      Grant CITGO its reasonable attorneys' fees and costs incurred in pursuing this

             action; and

    iii.     Grant such other relief as the Court deems just and proper.


Dated: March 31, 2021

                                    Respectfully submitted,

                                   /s/ *Mark J. Plumer*
                                  Mark J. Plumer (*pro hac vice*)
                                  mark.plumer@pillsburylaw.com
                                  David F. Klein
                                  david.klein@pillsburylaw.com
                                  Charrise Alexander
                                  charrise.alexander@pillsburylaw.com
                                  John Chamberlain
                                  john.chamberlain@pillsburylaw.com
                                  Pillsbury Winthrop Shaw Pittman LLP
                                  1200 17th Street NW
                                  Washington, DC 20036
                                  (202) 663-8000

                                  *Counsel for CITGO Petroleum Corporation*