UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CITGO PETROLEUM CORPORATION,            :
                                        :
                          Plaintiff,    :
                                        :
             -against-                  :
                                        :
STARSTONE INSURANCE SE, *et. al.*,      :
                                        :
                          Defendants.   :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/15/2023

1:21-cv-389-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

Here's an understatement:  When a democracy falters, bad things happen.  As amply demonstrated by recent events in Venezuela, if citizens cannot agree who their leaders are, or on the process by which those leaders are chosen, an array of unsavory consequences—legal uncertainty, civil strife, and even violent tyranny—can follow.

While those costs of political instability are well-known, this case involves a less obvious problem that can flow from the implosion of a democracy:  insurance disputes.  In early 2019, CITGO Petroleum Corporation ("CITGO" or "Plaintiff"), a United States subsidiary of the Venezuelan state-owned company Petróleos de Venezuela, S.A. ("PDVSA"), attempted to sail cargo out of Venezuela.  But before it could do so, United States sanctions triggered a dispute over the cargo; eventually, CITGO was forced to return it to Venezuela.  Now, CITGO brings this case against various insurance entities (the "Underwriters" or "Defendants") seeking compensation for that cargo under its insurance policy.

The primary question in this case is whether actions taken by Nicolas Maduro to consolidate power during the time that the cargo was lost represented an "insurrection" against the American-recognized government of Juan Guaidó.  If the answer to that question is "yes," then CITGO may be entitled to payment; if the answer is "no," Defendants here cannot be liable.  Having canvassed

relevant historical background, precedent, dictionaries, and supplemental briefing, the Court reaches an answer that only a lawyer could love: "maybe." Nonetheless, because New York law dictates that any ambiguities in an insurance contract be construed against the insurer, for Plaintiff, a "maybe" is as good as a "yes." So Plaintiff is entitled to summary judgment on that issue, and Defendants' motion for summary judgment—which depends entirely upon resolution of the "insurrection" question—must be denied in full.

As to the other issues presented, the Court will deny as premature Plaintiff's motion for summary judgment on the issue of causation but, because the insurance policy at issue makes clear that CITGO owned the cargo once it was loaded onto its boat, will grant Plaintiff's summary-judgment motion on the issue of cargo ownership. Finally, as described in more detail below, the Court will grant in part and deny in part Plaintiff's motion for judicial notice. In sum, (1) Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART, (2) Defendants' motion for summary judgment is DENIED, and (3) Plaintiff's motion for judicial notice is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND[1]

### A. Growing Political Strife in Venezuela

Upon then-President Hugo Chávez's death in March 2013, Nicolas Maduro assumed power as Interim President of Venezuela. Dkt. No. 58 (second amended complaint, or "SAC") ¶ 34. A month later, Mr. Maduro was elected to serve out the remainder of Mr. Chávez's term, which was set to end in January 2019. *Id.*

In 2015, a coalition opposed to Mr. Maduro won control of Venezuela's legislature, the National Assembly. App. to Dkt. No. 135 ¶ 3. On December 23, 2015, the legislators who had been voted out of the National Assembly called an "extraordinary session," purporting to appoint

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' summary-judgment motions. Unless otherwise stated, the facts are undisputed by the parties.

thirteen main judges and nineteen alternate judges to Venezuela's Supreme Court of Justice.  Dkt.

No. 151 ¶ 31.  Since then, that court has resolved disputes in favor of Mr. Maduro.  *Id.*  Plaintiff

casts this court as "illegitimate" and notes that it "has sought to shift the legislature's power to" Mr.

Maduro.  *Id.* (citing Dkt. No. 133 (Declaration of Carlos J. Sarmiento-Sosa, or "Sarmiento-Sosa

Decl.") ¶¶ 51–53).

      In May 2017, Mr. Maduro issued Presidential Decree 2830, which called for snap elections to

elect a "National Constituent Assembly."  *Id.* ¶ 33.  Plaintiff argues that this assembly was "formed

in violation of legal and constitutional requirements," and that its actions are accordingly "null and

void."  *Id.* (citing Sarmiento-Sosa Decl. ¶¶ 81–84).  A year later, in May 2018, Mr. Maduro again

organized snap elections—this time for the 2019–2025 presidential term.  *Id.* ¶ 39.  Mr. Maduro won

that election, which was boycotted by much of the opposition and the international community.  *Id.*

The United States State Department cast this election as "deeply flawed" and "neither free nor fair."

Dkt. No. 127 Ex. T (2018 State Department Human Rights Report) at 1; *see also id.* Ex. N (the "U.N.

Report") ¶¶ 95–99 (noting obstacles to opposition participation in the snap election).

      In response, Venezuela's National Assembly—which was controlled by legislators opposed

to Mr. Maduro—passed a resolution declaring Mr. Maduro's re-election illegitimate.  Dkt. No. 151

¶ 42.  The National Assembly then determined that, under Article 233 of the Venezuelan

Constitution, Juan Guaidó—the President of the National Assembly—was to serve as interim

president until free and fair elections could be held.  *Id.* ¶ 43.

      Throughout this period, Mr. Maduro and his supporters utilized the power of the state,

including violence and threats of violence, to retain power.  Mr. Maduro, for instance, prosecuted

and arrested many members of the opposition in the National Assembly.  *Id.* ¶¶ 32, 38 (citing Dkt.

No. 130 (Declaration of Rosmit Mantilla, or "Mantilla Decl.") ¶¶ 8, 15–19, 22).  On multiple

occasions, armed loyalists of Mr. Maduro raided the National Assembly building and attacked

parliamentary members, including at least one occasion where Maduro supporters assaulted and

physically removed National Assembly members from the National Assembly building. *Id.* ¶¶ 36–37 (citing Mantilla Decl. ¶¶ 20–21). And in response to protests against him, Mr. Maduro stated: "We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms." *Id.* ¶ 34 (citing the U.N. Report ¶ 89).

The United States government opposed Mr. Maduro's efforts to consolidate power and supported the Guaidó-led opposition. For instance, in August 2017, after Mr. Maduro called elections to create the "National Constituent Assembly," then-President Donald Trump issued an executive order imposing sanctions against Venezuela, castigating the "illegitimate" National Constituent Assembly as having "usurped the power of the democratically elected National Assembly," and condemning the "ongoing repression and persecution of, and violence toward, the political opposition." *Id.* ¶ 35 (citing Exec. Order No. 13,808, 82 Fed. Reg. 41,115 (Aug. 24, 2017)). The United States also did not recognize the result of the 2018 election, in which Mr. Maduro was purportedly re-elected. *Id.* ¶ 40. Instead, on the day that the National Assembly determined that Mr. Guaidó was the Interim President under the Venezuelan Constitution, President Trump "officially recogniz[ed] the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela." *Id.* ¶ 44. And then-Secretary of State Michael Pompeo issued a statement the same day noting that:

> The United States maintains diplomatic relations with Venezuela and will conduct our relations with Venezuela through the government of interim President Guaido, who has invited our mission to remain in Venezuela. The United States does not recognize the Maduro regime as the government of Venezuela. Accordingly the United States does not consider former president Nicolas Maduro to have the legal authority to break diplomatic relations with the United States or to declare our diplomats persona non grata.

*Id.* ¶ 45.

Nonetheless, Mr. Maduro "refused to cede control over the instruments of state power, preventing [Mr.] Guaidó from exercising authority within the country." *Id.* ¶ 46. As a result, on January 25, 2019, "in light of actions by persons affiliated with the illegitimate Maduro regime,

including . . . continued attempts to undermine the Interim President of Venezuela and [ ] the National Assembly . . . from exercising legitimate authority in Venezuela," President Trump issued further sanctions on Venezuela through Executive Order 13857.  *Id.* ¶ 47 (citing Exec. Order 13,857, 84 Fed. Reg. 509 (Jan. 25, 2019)).  That order denoted PDVSA as an instrumentality of the Venezuelan government, such that it was subject to sanctions:  Entities operating in the United States could no longer make payments to PDVSA.  *Id.* ¶ 48; *see* Dkt. No. 146 ¶ 20.  And those sanctions set in motion the events that would lead to this case.

### B.  "The Gerd" and Continued Civil Strife

In the midst of this turmoil, CITGO had chartered a vessel named the M/T Gerd Knutsen—colloquially known as "the Gerd"—to carry nearly one million barrels of Diluted and Pedernales crude oil ("the cargo") from Venezuela to Aruba.  Dkt. No. 151 ¶ 8; *see id.* ¶ 11.  From January 20–27, 2019, that oil was loaded onto the Gerd while it was anchored in the Gulf of Paria, Venezuela.  *Id.* ¶ 9.  And on January 28, 2019, the Gerd's master requested clearance to set sail for Aruba.  *Id.* ¶ 11.

But the Gerd would never get that requested clearance.  After President Trump and the United States had subjected PDVSA to sanctions on January 25, 2019, CITGO could no longer pay PDVSA, in cash, for the oil.  *See* Dkt. No. 146 ¶ 20.  CITGO argued that it had nonetheless already paid for the cargo through offsets, in accordance with the parties' Crude Supply Agreement ("CSA"), and so it was entitled to leave with the oil.  *See id.* ¶ 34.  But PDVSA claimed that the sanctions meant that CITGO could not pay—and had not paid—for the oil, and that the cargo therefore had to be returned to the Venezuelan government.  *See, e.g.*, *id.* ¶¶ 35–37.  Accordingly, on January 29, 2019, PDVSA informed the vessel that it was required "to stay at anchorage and wait for further instructions."  *Id.* ¶ 24.  And on February 1, 2019, PDVSA requested that CITGO return the cargo to PDVSA.  *Id.* ¶ 25.

While the parties dispute whether CITGO briefly agreed to do so, *see id.*, there is no dispute that by the end of February 2019, CITGO and PDVSA were in a standoff:  CITGO wanted the Gerd to leave port, but PDVSA would not allow that to happen unless CITGO turned over the oil. *Id.* ¶ 27.  That deadlock lasted for over a year, as the Gerd's masters requested clearance to leave Venezuela's waters and were either ignored or rebuffed.  Dkt. No. 151 ¶ 57.  During that time, Mr. Guaidó appointed a new ad hoc Managing Board of PDVSA; that resulted in the appointment of a new managing board of CITGO, which a United States court has recognized as CITGO's legitimate board. *Id.* ¶¶ 58–59; *see Jiménez v. Palacios*, 250 A.3d 814, 827–32 (Del. Ch. 2019), *as revised* (Aug. 12, 2019).  On August 30, 2019, the Procuador Especial (Attorney General) of Venezuela appointed by Mr. Guaidó ordered that the Gerd be allowed to depart with the cargo.  Dkt. No. 151 ¶ 65.  But that directive was ignored by the Venezuelans in control of the harbor.  *Id.* ¶ 66.

Several attempts were made to get CITGO to return the cargo.  In November 2019, two letters were sent by the Maduro-appointed board of PDVSA to the Gerd instructing the ship's masters to return the cargo; the second stated that the board of directors of CITGO had ratified a resolution directing the Gerd to deliver the cargo to PDVSA.  *Id.* ¶¶ 67–68.  But the Gerd did not return the cargo and the latter letter was withdrawn after CITGO sought and obtained emergency relief from the United States court that had recognized the Guaidó-appointed CITGO board.  *Id.* ¶ 69; *see Jiménez v. Palacios*, No. 2019-0490-KSJM, 2019 WL 6915935, at *1 (Del. Ch. Dec. 17, 2019). Then, in December 2019, a purported PDVSA representative boarded the Gerd and presented the ship's master with a Venezuelan court order that directed the Gerd's master to discharge the cargo. *Id.* ¶ 70.  But CITGO understood that order to be illegitimate, and thus directed the master not to comply with it.  *Id.* ¶ 71.

Meanwhile, civil unrest continued to unfold in Venezuela.  Mr. Maduro and his supporters seized other vessels and their cargoes in Venezuelan waters.  *Id.* ¶ 50.  Plaintiff states that when Mr. Guaidó and his allies attempted to coordinate a caravan to bring humanitarian aid into Venezuela

from surrounding countries, Venezuelan military members and armed civilian militias killed seven individuals and injured hundreds as they prevented the aid caravan from crossing the border. *Id.* ¶¶ 60–61. After Mr. Guaidó attempted to obtain the support of the Venezuelan military, national guard members and militias loyal to Mr. Maduro instead violently put down supporters of Mr. Guaidó. *Id.* ¶¶ 62–63. Throughout 2019, Mr. Maduro and his loyalists engaged in extrajudicial killings, forced disappearances, torture, and arbitrary detention of those opposed to Mr. Maduro, and subjected many of those individuals to harsh and life-threatening prison conditions. *Id.* ¶ 72 (citing Dkt. No. 127 Ex. U (2019 State Department Human Rights Report) at 2). And Mr. Maduro and his supporters also targeted the Guaidó-controlled National Assembly and its members, efforts that included killing one opposition councilman and attempting to forcibly take control of the National Assembly building. *Id.* ¶¶ 73–74.

On February 7, 2020, a purported PDVSA member notified the Gerd's master—pursuant to another Venezuelan court order, of which CITGO again contested the legitimacy—that it was being required to sail the Gerd to another Venezuelan port (Puerto la Cruz), where it would be required to discharge the cargo to PDVSA. *Id.* ¶ 77. The master was informed that the Gerd would be escorted by a naval vessel, and that Venezuelan National Guard personnel would ensure compliance. *Id.* The Gerd then sailed to Puerto la Cruz, whereafter—on February 9, 2020—two Venezuelan military vessels approached it. *Id.* ¶¶ 77–78. One vessel had a mounted machine gun; the other carried military personnel and PDVSA representatives to compel the master to discharge the cargo. *Id.* ¶ 78. While the master issued a letter of protest, he ultimately complied by sailing the Gerd into port. *Id.* ¶ 79. On or about February 11, 2020, the Gerd arrived at port, and the cargo was removed from the Gerd and given to PDVSA. *Id.* ¶ 81.

### C. The Parties' Insurance Agreement and this Litigation

On February 11, 2020, CITGO sent Defendants here—a group of unincorporated syndicates and corporations (alternately described as the "Underwriters")—a Notice of Actual Loss,

pursuant to its insurance policy (the "Policy").  SAC ¶ 96; *see* Dkt. No. 151 ¶ 3.[2]  The Policy states

that "it shall be governed by and construed in accordance with the laws of the State of New York,

United States of America."  Dkt. No. 151 ¶ 4.  The Policy *excludes*, under the "Institute Cargo

Clauses," coverage of losses arising from certain risks—including "capture[,] seizure[,] arrest[,]

restraint[,] or detainment (piracy excepted), and the consequences thereof or any attempt thereat."

Dkt. No. 75 Ex. 2 at 4.  But the Policy then *adds back in*, under the "Institute War Clauses," coverage

for other losses—including those arising from "capture[,] seizure arrest[,] restraint[,] or detainment,

arising from" "war[,] civil war[,] revolution[,] rebellion[,] insurrection, or civil strife arising

therefrom."  *Id.* at 10.  CITGO's February 11, 2020 Notice of Actual Loss asserted coverage from

these War Clauses.  SAC ¶ 96; *see id.* ¶ 93 (noting that CITGO had sent an October 2019 letter to

the Underwriters previously asserting that the coverage for losses arising from insurrection meant

that any potential losses should be covered by the Policy).  But on March 18, 2020, the Underwriters

denied CITGO's claim, and specifically denied that the unrest in Venezuela constituted an

"insurrection" within the meaning of the Policy.  *Id.* ¶ 97.

    In January 2021, CITGO initiated this case against the Underwriters.  Dkt. No. 1.  CITGO

filed its active complaint on March 31, 2021.  Dkt. No. 58.  It alleged a breach of the insurance

policy, which CITGO claims resulted in damages that it anticipates exceeding $40 million.  SAC

¶¶ 106–116.  Specifically, CITGO alleges that the cargo was lost from events that arose from an

insurrection, and that the Policy therefore covers the losses.  SAC ¶¶ 110–111; *see* Dkt. No. 124 at

1–2 (CITGO identifying that its theory of coverage is that the losses arose from an insurrection).

Defendants deny that the losses arose from an insurrection, and accordingly argue that they do not

owe CITGO any payment from the lost cargo.  *See* Dkt. No. 136 ¶¶ 1–5.

---

[2] Two other entities—Illuminant Insurance Company and Trimark Insurance Company, Ltd.—were also involved in the insurance relationship, but are not parties to this case; the parties have agreed that CITGO may pursue its claims directly against the Underwriters.  *See* SAC ¶¶ 9–10.

This order resolves three motions, each filed on March 14, 2022. First, Plaintiff filed a motion for partial summary judgment, requesting that the Court (1) find that an insurrection occurred in Venezuela after January 2019, (2) resolve the standard to apply for causation of the cargo's loss, and (3) reject Defendants' affirmative defense claiming that CITGO did not own the cargo when it was lost. Dkt. No. 123 (motion); Dkt. No. 124 (memorandum in support) at 1–2. That motion has been fully briefed. *See* Dkt. No. 149 (Defendants' opposition); Dkt. No. 153 (Plaintiff's reply). Second, Defendants filed their own motion for summary judgment, asking the Court to find that the losses did not arise from an insurrection and to dismiss Plaintiff's case. Dkt. No. 136 (motion); Dkt. No. 137 (memorandum in support) at 23–24. That motion has also been fully briefed. *See* Dkt. No. 144 (Plaintiff's opposition); Dkt. No. 156 (Defendants' reply). Finally, Plaintiff filed a motion for judicial notice of certain facts related to its partial summary-judgment motion. Dkt. No. 134. That motion, like the others, is fully briefed. *See* Dkt. No. 152 (Defendants' opposition); Dkt. No. 155 (Plaintiff's reply).

## II. LEGAL STANDARDS

### A. Motion for Judicial Notice

Under Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." If a party requests judicial notice of a fact "and the court is supplied with the necessary information," then the court "must take judicial notice" of that fact. Fed. R. Evid. 201(c).

"Central to Rule 201 . . . is the notion that federal courts take judicial notice of facts, not documents." *In re Manning*, 620 B.R. 199, 207 (W.D.N.Y. 2020); *see Abu-Joudeh v. Schneider*, 954 F.3d 842, 848 (6th Cir. 2020) ("[C]ourts do not take judicial notice of documents, they take judicial notice of facts."). Several courts have noted that "[a] party requesting judicial notice bears the burden of

persuading the trial judge that the fact is a proper matter for judicial notice." *See, e.g.*, *Wise v. City of Portland*, 539 F. Supp. 3d 1132, 1143 n.8 (D. Or. 2021) (internal citation omitted); *see also* Charles A. Wright & Arthur A. Miller, 21B Federal Practice & Procedure § 5108 (2d ed. 2022) (noting that, to require a court to take judicial notice under Fed R. Evid. 201(c), a party must "provide information from which the court can conclude" that the source within which the fact is contain is one "whose accuracy cannot reasonably be questioned"); *id.* § 5106.2 ("The burden of showing the accuracy lies on the proponent of notice."). That said, courts are permitted—though not required—to go outside of the information provided by the parties to determine if a fact is the proper subject of judicial notice. *See id.* § 5108 & nn.73–77.

### B. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he or she "may

not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted).

Still, "[t]he possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

**C. Interpretation of Insurance Contracts**

Under New York law, "[i]n determining a dispute over insurance coverage, [courts] first look to the language of the policy. We construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 5 N.Y.3d 157, 162 (2005); *see also Fed. Ins. Co. v. Int'l Bus. Machines Corp.*, 18 N.Y.3d 642, 646 (2012) ("In analyzing the meaning of an insurance policy provision, it is necessary to determine the 'reasonable expectations of the average insured.'" (quoting *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011)). A threshold question for the Court to answer is whether the insurance agreement is ambiguous or not. *See Corter-Longwell v. Juliano*, 161 N.Y.S. 3d 525, 529 (4th Dep't 2021). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of

the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Selective Ins. Co. of Am. v. Cnty. of Rensselaer*, 26 N.Y.3d 649, 655 (2016) (quoting *Greenfield v. Phillies Recs.*, 98 N.Y.2d 562, 569 (2002)).  By contrast, an insurance agreement is ambiguous if "there is a reasonable basis for a difference of opinion as to the meaning of the policy." *Id.* at 655–56.

"[I]f an insurance policy is 'clear and unambiguous,' it is to be given its 'plain and ordinary meaning,' and courts are to refrain from rewriting the agreement." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010) (quoting *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 90 (2d Cir. 2009)).  For unambiguous contracts, meaning must therefore be determined "without reference to extrinsic materials outside the four corners of the document." *Goldman v. White Plains Ctr. for Nursing Care, LLC*, 11 N.Y.3d 173, 176 (2008).

If a policy is ambiguous, however, "the parties may submit extrinsic evidence as an aid in construction." *New York v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985).  Typically, resolving ambiguity using this evidence "is for the trier of fact," not the Court.  *Id.*  But "if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court." *Id.*; *see City of New York v. Evanston Ins. Co.*, 830 N.Y.S. 2d 299, 302 (2d Dep't 2007).  "Under those circumstances, the ambiguity must be resolved against the insurer." *Id.*; *see Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 682 (2017) ("Of course, where the policy may be reasonably interpreted in two conflicting manners, its terms are ambiguous . . . and any ambiguity must be construed in favor of the insured and against the insurer." (citations and quotation marks omitted)).

## III. MOTION FOR JUDICIAL NOTICE

Plaintiff requests judicial notice of two sets of facts.  First, it asks the court to take notice of "[a] statement of then-United States President Donald Trump, dated January 23, 2019, recognizing Juan Guaidó as interim president," and "[a] Press Statement of then-United States Secretary of State Michael Pompeo, dated January 23, 2019, in which Pompeo recognized Guaidó and stated the

Maduro did not have 'legal authority' as president." Dkt. No. 135 at 3; *see* Dkt. No. 127 Ex. V (Trump statement); *id.* Ex. W (Pompeo statement). Second, Plaintiff requests that the Court take notice of twenty facts from United States State Department Country Reports, a Congressional Research Service Report, and United Nations Reports. Dkt. No. 135 at 4–7 (request); *see* App. to Dkt. No. 135 (list of facts). The Court will judicially notice the first statements for the truth of identifying the positions articulated in them, but will not judicially notice the contents of the statements for their truth. And the Court will judicially notice some, but not all, of the second set of facts—those that are beyond reasonable dispute and that do not constitute opinions.

The Court judicially notices the statements of former President Trump and former Secretary Pompeo as evidence of "the official positions articulated in these statements," but does not judicially notice the truth of "the predicate facts underlying those official positions." Dkt. No. 135 at 3. It is not "subject to reasonable dispute" that former President Trump and former Secretary Pompeo made the statements identified in the press releases. Nor is it disputable that those statements represented the United States' position on the legitimate government of Venezuela. *See* Fed. R. Evid. 201(b). And "[a] press release is a source whose accuracy 'cannot reasonably be questioned' *as to the fact that the statements contained therein were made.*" *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y. 2019) (emphasis added).

But the truth of statements concerning geopolitical conflict, without evidence definitively proving the indisputability of the given assertions, is generally an inappropriate subject for judicial notice. *See, e.g.*, *Eain v. Wilkes*, 641 F. 2d 504, 512 n.9 (7th Cir. 1981) (declining to notice facts from "reports alleging torture in Israeli prisons" because of the lack of unanimity as to the accuracy of those facts). And here, many of the underlying facts and positions taken in the Trump and Pompeo statements *are* subject to dispute. *See, e.g.*, Dkt. No. 146 ¶¶ 17–18 (noting that some states and entities have recognized Mr. Guaidó, while others have recognized Mr. Maduro, as Venezuela's legitimate president); *see also* Fed. R. Civ. P. 201 advisory committee's notes (noting the "high degree

of indisputability" required by the rule).[3]  In any event, Plaintiff's reply brief on this issue appears to

close by limiting its request to taking judicial notice of the statements as evidence of the

government's positions:  "[T]he Court can and should take notice of the Government's official

positions, as articulated by the Government itself."  Dkt. No. 155 at 3.  The Court agrees, and

therefore takes judicial notice of these statements for the purpose of identifying the United States

Government's position on the legitimate government of Venezuela.

    As for Plaintiff's second judicial notice request—facts from State Department Country

Reports, a Congressional Research Service Report, and United Nations Reports—the Court finds

that some, but not all, of these facts are judicially noticeable.  Plaintiff correctly notes that, as a

general principle, these are the types of sources "whose accuracy cannot reasonably be questioned,"

*see* Fed. R. Evid. 201(b); many courts have taken notice of these facts from these (and similar) types

of reports.  *See, e.g.*, *Farrok v. Holder*, 407 F. App'x 545, 547 (2d Cir. 2011) (summary order) (taking

notice of a State Department Country Report on Human Rights Practices in Sri Lanka); *Kareem v.

Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021) (taking notice of a fact within a Congressional

Research Service report on conflict in Syria); *Barber v. Nestlé USA, Inc.*, 154 F. Supp. 3d 954, 958 n.1

(C.D. Cal. 2015) (taking notice of facts within a United Nations document); *see also* 21B Wright &

Miller, *supra*, § 5106.3 & n.18 (noting that government records are generally proper sources from

which adjudicative facts can be judicially noticed).

    Nonetheless, that a statement appears in a government document does not necessarily mean

that it is judicially noticeable.  The fact must still meet the "high degree of indisputability" required

by Rule 201.  *See* Fed. R. Civ. P. 201 advisory committee's notes.  And as a "rule of thumb," a

---

[3] To be clear, as explained in Part IV of this opinion, this Court recognizes Mr. Guaidó—based on the official position of the United States Government—as having been Venezuela's President during the events underlying this case.  *See Zivotofsky v. Kerry*, 576 U.S. 1, 17 (2015); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).  But the question in evaluating a judicial notice motion is not the Court's position, but rather whether there is "reasonable dispute" about a given fact; for the reasons explained, there is sufficient dispute about the facts underlying the statements here that it would be inappropriate for the Court to judicially notice them as true.

purported "'fact' will more likely be found 'disputable' if it falls on the opinion end of the traditional 'fact-opinion' spectrum." 21B Wright & Miller, *supra*, § 5104. Applying that principle, the Court judicially notices the facts listed at paragraphs 2, 3, 7, 8, 12, 13, 16, 17, and 19, as well as the first sentence of paragraph 15, in Plaintiff's appendix to the judicial-notice motion, which constitute facts that are not subject to reasonable dispute. *See* App. to Dkt. No. 135. But the court declines to judicially notice the remaining facts for the following reasons:

- **Paragraph 1:** Describes the "authoritarian regime" of Nicolas Maduro as having "usurped control" and describes the 2018 elections as "neither free nor fair"; these are opinioned phrases the Court cannot judicially notice;

- **Paragraph 4:** In the quote "purported to 'annul,'" the term "purported to" is added to the language of the State Department report; the Court cannot judicially notice this opinion on whether the National Assembly's functions were in fact annulled;

- **Paragraph 5:** The allegation that Maduro "attempted to recapture legislative power" through snap elections does not appear in the U.N. Report; the Court cannot judicially notice this opinion on the motivation for the snap elections;

- **Paragraph 6:** In the quote "[t]hese events 'triggered,'" the words "these events" are added to the State Department report; an examination of that report does not show that it asserted the same causal connection between the events described in paragraphs five and six of Plaintiff's appendix;

- **Paragraph 9:** The terms "neither free nor fair" and "deeply flawed political process" are opinioned statements that the Court cannot judicially notice;

- **Paragraph 10:** The term "former regime's usurpation of power" includes a contested fact that the Court cannot judicially notice;

- **Paragraph 11:** The term "[f]ormer president Maduro" is a contested fact that the Court cannot judicially notice;

- **Paragraph 14:** The terms "former Maduro regime," "arbitrary arrest," and "politically motivated prosecution" are all either contested facts or opinioned statements that the Court cannot judicially notice;

- **Paragraph 15 (Second Sentence):** The term "excessive use of force" is an opinioned statement and contested fact that the Court cannot judicially notice;

- **Paragraph 18:** The term "in an attempt to seize control of the National Assembly" is a statement that does not appear in the State Department report; the Court cannot judicially notice this opinion on why Mr. Maduro's loyalists took the actions described in the report;

- **Paragraph 20:** The terms "lacked independence" and "judged in favor of the illegitimate regime" are opinioned statements that the Court cannot judicially notice.

## IV. DISCUSSION

Because the unusual facts of this case reveal ambiguity in the meaning of the term "insurrection" as used in the Policy, and because—absent relevant extrinsic evidence—any ambiguity must be construed against Defendants, Plaintiff's motion for summary-judgment will be granted (and Defendants' motion will be denied) as to the meaning of insurrection within the Policy. Additionally, because the text of the sales agreement between CITGO and PDVSA makes clear that CITGO owned the cargo as soon as it was loaded onto the Gerd, Plaintiff's motion for summary judgment will be granted as to the issue of cargo ownership at the time of loss.[4]

### A. Whether an Insurrection Occurred Within the Meaning of the Policy

The term "insurrection" as used in the parties' insurance contract is ambiguous. Reasonable people could disagree about the meaning of the term—and those different reasonable interpretations yield very different results when applied to the facts of this case. And because any ambiguity in the policy's coverage must be construed in CITGO's favor, the Court must construe the term such that it covers the events in Venezuela after January 2019.

The Policy is construed in accordance with New York law. Dkt. No. 151 ¶ 4. In New York, to adjudicate a "dispute over insurance coverage," a Court must "first look to the language of the policy." *Raymond Corp.*, 5 N.Y.3d at 162 (2005). In doing so, the Court's goal is to "determine the 'reasonable expectations of the average insured.'" *Fed. Ins. Co.*, 18 N.Y.3d at 646 (quoting *Cragg*, 17

---

[4] CITGO has also moved for summary judgment on the issue of what legal test applies to determine whether the cargo loss was "caused by" an insurrection. *See* Dkt. No. 124 at 18–20. That aspect of CITGO's motion is denied. CITGO asks the Court to declare, as a matter of law at this stage, that "in providing for coverage of seizures 'arising from' an insurrection or civil strife arising therefrom, the Policy only requires some causal link, even if attenuated." *Id.* at 18. But as CITGO recognizes, there are numerous factual disputes about causation that cannot be resolved here. *See id.* at 18 n.9. As a result, adopting CITGO's causation test now would do little to help streamline the case's resolution, because exactly the type of "causal link" required between an insurrection and the seizure will almost certainly be subject to dispute between the parties. And given the continued fact disputes between the parties about the link between any insurrectionary acts and the loss of the cargo, previewing a view on the causation question now risks providing an advisory opinion—that is, "an opinion advising what the law would be on a hypothetical state of facts." *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 85 (2d Cir. 2018) (quoting *In Matter of Motors Liquidation Co.*, 829 F.3d 134, 168 (2d Cir. 2016)). This the Court cannot do. *Id.* Accordingly, CITGO's motion for summary judgment is denied as to its request for the Court to determine the standard of causation appliable in this case.

N.Y.3d at 122).  And the threshold question to answer is whether the Policy is ambiguous or not. *Corter-Longwell*, 161 N.Y.S. 3d at 529.  For the reasons that follow, the Court holds that the meaning of "insurrection" in the Policy is ambiguous revealed in the light of this case's unique facts.

The parties agree that the "the word insurrection means '(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers.'" *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1017 (2d Cir. 1974) ("*Pan Am*") (quoting *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098, 1124 (S.D.N.Y. 1973)); *see* Dkt. No. 153 at 2–5 (Plaintiff treating *Pan Am* as the governing case on the meaning of insurrection); Dkt. No. 137 at 4–5 (Defendants doing the same).  They further agree, moreover, on the basic facts of what happened on the ground in Venezuela during the time before and during the loss of the cargo:

- After a coalition opposed to Mr. Maduro's control won control of the National Assembly, Maduro loyalists were purportedly appointed to the Venezuelan Supreme Court; that Court has since resolved disputes in Mr. Maduro's favor.  *See* Dkt. No. 151 ¶ 31; Sarmiento-Sosa Decl. ¶¶ 51–53.

- After Mr. Maduro called for a snap election in May 2018 through which he claimed to have been re-elected, Venezuela's National Assembly—which remained opposed to Mr. Maduro—passed a resolution declaring Mr. Maduro's re-election illegitimate and purported to declare Juan Guaidó the interim president.  Dkt. No. 151 ¶¶ 39, 42–43.

- Once the National Assembly declared Mr. Guaidó the interim president, the United States government recognized Mr. Guaidó, not Mr. Maduro, as the head of the Venezuelan government.  *Id.* ¶ 45.

- Mr. Maduro utilized violence, including violence of armed forces loyal to him, in prosecuting opposition members of the National Assembly.  *Id.* ¶¶ 32, 38.  His supporters attacked those supporting Mr. Guaidó.  *Id.* ¶¶ 36–37, 62–63, 73–74.  And in response to protests, Mr. Maduro stated that "what could not be done with votes, we will do with arms.  We will liberate our nation with arms."  *Id.* ¶ 34.

- Because Mr. Maduro never ceded the instrumentalities of power in Venezuela, Mr. Guaidó was prevented from "exercising authority within the country" throughout the period relevant to this litigation.  *Id.* ¶ 46; *see also id.* ¶¶ 62–63 (Mr. Guaidó failed to take control of any aspect of the Venezuelan military).

After that, however, any agreement runs out:  The parties disagree vehemently about whether these facts indicate that Mr. Maduro's grasp on power represented an insurrection.  CITGO argues that Mr. Maduro's refusal to yield to Mr. Guaidó's legitimate government represented a (successful) insurrection within the meaning of the parties' insurance agreement.  *See* Dkt. No. 144 at 9.  But Defendants contend that no insurrection can occur where, as here, the purported insurrectionary party—Mr. Maduro's forces—do not lose their grip on all of the levers of power, and the supposed "ruling" party—Mr. Guaidó and his supporters—never wields any actual power in the country.  *See* Dkt. No. 137 at 14–15.

   To start, one premise underlying CITGO's argument is inarguably correct:  This Court must recognize Mr. Guaidó as the Venezuelan President during the events in question.  Under well-settled rules, the United States President enjoys the "exclusive" power to "recognize foreign governments." *Zivotofsky v. Kerry*, 576 U.S. 1, 17 (2015).  Such recognition, moreover, "conclusively binds" the judiciary.  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918); *see also Casa Express Corp. v. Bolivarian Republic of Venez.*, 492 F. Supp. 3d 222, 226 (S.D.N.Y. 2020) (finding that the United States government's recognition of Mr. Guaidó as president was "binding on [the] Court"); *Zivotofsky*, 576 U.S. at 14 ("[T]he Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not.").  The United States Executive Branch recognized Mr. Guaidó as Venezuela's president on January 23, 2019.  Dkt. No. 151 ¶¶ 44–45.[5]  So this Court is

---

[5] As of this opinion's publication, the "United States continues to recognize the democratically elected 2015 National Assembly as the last remaining democratic institution in Venezuela."  *See* Press Statement, Ned Price, Dep't Spokesperson, U.S. Dep't of State (Jan. 3, 2023), https://www.state.gov/venezuelas-interim-government-and-the-2015-national-assembly/; *PDVSA US Litig. Tr. v. Lukoil Pan Americas LLC*, No. 22-10675, Slip op. at 5–6 (11th Cir. Mar. 13, 2023) (recognizing this fact).  Reports differ as to what that means for United States' recognition of Mr. Guaidó as Venezuela's rightful leader.  *Compare* Dave Lawler, *U.S. No Longer Recognizes Guaidó as Venezuela's President, Biden Official Confirms*, Axios (Jan. 4, 2023), https://www.axios.com/2023/01/04/us-stops-recognizing-juan-guaido-venezuela (citing an anonymous official in President Biden's State Department as no longer considering Mr. Guaidó to be Venezuela's President after the Venezuelan National Assembly voted to dissolve his interim government), *with* Trevor Hunnicutt et al., *Washington Coy on Venezuela's Guaido, Still Recognizes 2015 National Assembly*, Reuters (Jan. 4, 2023, 8:05 PM), https://www.reuters.com/world/americas/us-continues-recognize-venezuelas-2015-national-assembly-interim-president-white-2023-01-04/ (citing sources indicating that because the United States "still recognizes Venezuela's 2015 National Assembly" as Venezuela's "last remaining democratic institution," it "will keep coordinating with its former

required to treat Mr. Guaidó as Venezuela's ruler when the cargo was lost. *See supra* Part I(B) (noting that the series of events leading to the lost cargo ran from late January 2019 through February 2020). And within the *Pan Am* definition, that means that the Court must treat Mr. Guaidó—not Mr. Maduro—as "the constituted government" of Venezuela during that time. *See Pan Am.*, 505 F.2d at 1017; *see also id.* at 1005 ("[F]or there to be an 'insurrection' there must be an intent to overthrow a *lawfully constituted* regime." (emphasis added)); Dkt. No. 153 at 2–4 (Plaintiff arguing that this Court must recognize Mr. Guaidó as the constituted government within the *Pan Am* analysis).

As far as Plaintiff is concerned, that settles things. Mr. Maduro and his supporters, Plaintiff notes, used violence to put down Mr. Guaidó's supporters—that is, supporters of the constituted government. *See* Dkt. No. 151 ¶¶ 32, 36–38, 73–74. And Mr. Maduro had an intent to prevent Mr. Guaidó from effectuating any governmental functions. *See id.* ¶ 34 (in response to protests, Mr. Maduro stating: "[W]hat could not be done with votes, we will do with arms. We will liberate our nation with arms."). In CITGO's view, these facts mean that the events in Venezuela fell unambiguously within the *Pan Am* definition of insurrection: "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." 505 F.2d at 1017.

But as Defendants point out, there is something odd about CITGO's preferred conclusion. Namely, it is undisputed that because Mr. Maduro never lost his grip on the Venezuelan military or Supreme Court during this time, Mr. Guaidó wielded little-to-no *de facto* power during the time he was recognized by the United States as the leader of Venezuela's government. *See* Dkt. No. 151 ¶ 46 ("Maduro . . . refused to cede control over the instruments of state power, preventing interim president Guaidó from exercising authority within the country."); Dkt. No. 156 at 2 ("Guaidó's

---

leader Juan Guaido"). But that question is immaterial here, because—as neither party disputes—what matters is who the United States recognized as Venezuela's leader *when the cargo was lost*; as described above, the answer is Mr. Guaidó.

leadership of the National Assembly does not mean Guaidó ever held any governmental power.").[6]
That makes *Pan Am*'s definition a trickier fit than Plaintiff suggests, Defendants say, because *Pan Am*
requires that an insurrectionary party operate for the purpose of "seizing" the government's
"*powers*."  505 F.2d at 1017 (emphasis added).

Other parts of *Pan Am*'s definition, moreover, also map imperfectly onto Plaintiff's
argument that the Maduro government represented an insurrection.  For instance, under *Pan Am*,
there must have been a "violent *uprising*" for the purpose of "*overthrowing*" the constituted
government.  *Id.* (emphases added).  Both "uprising" and "overthrowing" can reasonably be read to
connote a group with less power displacing (or attempting to displace) a group with greater power.
*See Uprising*, Oxford English Dictionary (Online, Updated September 2022) ("5.  Advancement in
place or power; improvement in position or circumstances."); *Overthrow*, Oxford English Dictionary
(Online, Updated September 2022) ("3.  To cast down (a person or group of people) from a position
of influence, prosperity, etc.").  If that is the how those words are read in *Pan Am*, then it is hard to
see how the Maduro forces—which at all times held far more power than Guaidó loyalists—could
have been a part of an 'uprising' that 'overthrew' Mr. Guaidó's government.  And if Mr. Maduro's
actions did not constitute an uprising or an attempt to overthrow Mr. Guaidó's government, then
there can be no insurrection within the *Pan Am* definition.

But if Plaintiff's conclusion—that Mr. Maduro's actions unambiguously represented an
insurrection—is imperfect, so too is Defendants' supposition that those actions were unambiguously

---

[6] Mr. Guaidó's recognition by some foreign nations—including the United States—as Venezuela's leader did give him
some *de facto* power.  See Dkt. No. 144 at 9–10 (Plaintiff noting that Mr. Guaidó "retain[ed] control over the U.S.-
recognized Board of PDVSA (and indirectly, CITGO); foreign embassies in many nations; and extensive foreign
assets").  Even so, Mr. Guaidó had no *de facto* power within Venezuela.  See Dkt. No. 151 ¶ 46 (Mr. Maduro "refused to
cede control over the instruments of state power, preventing [Mr.] Guaidó from exercising authority within the
country").  The parties dispute in the first instance whether Mr. Guaidó's "powers" derived from his recognition by
foreign governments are the kind of powers that can be "seized" under the *Pan Am* insurrection definition.  *Compare*
Dkt. No. 144 at 9–10 (Plaintiff arguing that these powers count under *Pan Am*), *with* Dkt. No. 156 at 1–3 (Defendants
arguing the opposite).  That this is an issue that can reasonably be disputed contributes to the Court's conclusion that
the definition is ambiguous, as revealed by the facts of this case.

*not* insurrectionary.  Most fundamentally, it is far from clear that this Court should read any *de facto* power requirement into *Pan Am*'s definition.  Treating Mr. Guaidó as the constituted government, as this Court must, *Pan Am* requires only that an insurrectionary party act to "seize *its* powers."  505 F.2d at 1017 (emphasis added).  No language in that phrase clearly mandates that the constituted government have a specified degree or type of power to be seized.[7]  And while, as described above, some definitions of 'uprising' and 'overthrow' suggest that they can only occur where a power imbalance exists, not all definitions are in accord.  *See Uprising*, Oxford English Dictionary (Online, Updated September 2022) ("7.  An insurrection; a popular rising against authority *or for some common purpose*." (emphasis added)); *Overthrow*, Oxford English Dictionary (Online, Updated September 2022) ("4b.  To bring down, depose, *or put an end by force to* (a government, institution, etc.)." (emphasis added)).[8]

Given all of this, an ordinary person could read the *Pan Am* definition and reasonably agree with either party about whether an insurrection occurred in Venezuela after January 2019.  It would be perfectly sensible to view *Pan Am* as imposing no requirement that the constituted government exercise a minimum threshold of *de facto* power, and to therefore interpret the actions of Mr. Maduro's forces as "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers."  505 F.2d at 1017.  But one might instead reasonably focus on *Pan Am*'s language about seizing power, and read that phrase—together with possible power-centric definitions of 'uprising' and 'overthrow'—to mean

---

[7] In particular, the phrase does not require that the powers to be seized include the police or military powers of the state.
[8] The parties' other disputes about the Maduro regime's "violence" and "intent," moreover, rebound back to this central disagreement about power.  *Compare* Dkt. No. 137 at 10–15 (Defendants arguing that Mr. Maduro did not engage in a violent uprising or have insurrectionary intent), *with* Dkt. No. 144 at 4–5 (Plaintiff arguing to the contrary).  That is because there is no disagreement that Mr. Maduro and his supporters used violence to suppress Mr. Guaidó and his allies.  *See* Dkt. No. 151 ¶¶ 32, 36–38, 62–63.  Nor is there any dispute that Mr. Maduro intended to aggregate power for himself, at the expense of opposition forces.  *See id.* ¶ 34.  So if the Guaidó government is considered an entity that could be insurrected against—that is, if it need not have wielded significant *de facto* power for an insurrection to be possible—then Mr. Maduro's violent actions to take control of Venezuela's governmental institutions were insurrectionary; if not, then not.

that under *Pan Am*, no insurrection can occur against a government that lacks meaningful powers to be seized.  *See id.*

Rather than clarifying this ambiguity, caselaw merely highlights the novelty of the question here.  Defendants correctly argue that in every case over the course of over sixty years to find the existence of an insurrection within the meaning of an insurance policy, the insurrection has occurred against—not by—the "established, effective and de facto government."  Dkt. No. 137 at 8; *see, e.g.*, *Home Ins. Co. of New York v. Davila*, 212 F.2d 731, 738 (1st Cir. 1954) (noting that if Puerto Rican extremists had a "maximum objective" to "overthrow of the insular government" on the island, that group's uprising would constitute insurrection); *Hartford Fire Ins. Co. v. W. Union Co.*, No. 22-cv-0557, 2022 WL 4386838, at *1, *3–5 (S.D.N.Y. Sept. 22, 2022) (a Russian-backed separatist group's attack on a plane in service of overthrowing the current government in eastern Ukraine was an insurrectionary act); *Younis Bros. & Co., Inc. v. CIGNA Worldwide Ins. Co.*, 91 F.3d 13, 14–15 (3d Cir. 1996) (applying *Davila* and *Pan Am* in finding that, where individuals outside of the Liberian government "led their respective armies in a violent uprising" "against the Liberian government," damage to properties fell within an insurance contract's insurrection clause).  Defendants read these cases to suggest that an insurrection *cannot occur* except as against the government with *de facto* power—which, in Venezuela during the period relevant to this litigation, has always been the Maduro regime.  Dkt. No. 137 at 8.

These cases, however, cannot bear that dispositive weight.  They considered the meaning of insurrection where the same group held both legal and actual power in a country.  And under those (typical) circumstances, the ambiguity of the *Pan Am* definition revealed by this case's facts is not material:  an insurrection occurred when an outside group conducted acts of violence meant to overthrow the (single) established government and seize its powers.  505 F.2d at 1017.  But from *Davila* in 1951 to *Hartford Fire* in 2022, no case has considered whether or how an insurrection can occur on this case's extraordinarily unusual facts; namely, where the Court must treat one group as

the "constituted government" because of United States recognition but that same group holds little or no *de facto* power. Usually, the term "constituted government" (rather than "overthrow" or "uprising") would limit the existence of an insurrection to attempts to overthrow a government with *de facto* control. But here, because of the recognition doctrine, the phrase "constituted government" cannot do the work that it might in other circumstances. So the holdings of past cases construing the term insurrection in insurance policies are of little use in determining whether the term insurrection requires the target of the insurrection to exercise *de facto* power and, if so, to what extent. The question was not presented.[9]

In short, "there is a reasonable basis for a difference of opinion as to the meaning of the [insurance] policy" and whether, under that policy, Mr. Maduro's hold on power represented an insurrection. *Selective Ins. Co.*, 26 N.Y.3d at 655–56. On these facts, the Policy is therefore ambiguous. *Id.*

Under New York law, if an insurance policy is ambiguous, "the parties may submit extrinsic evidence as an aid in construction." *Home Indem. Co.*, 66 N.Y.2d at 671. That extrinsic evidence is designed to illuminate the parties' "intent at the time of contracting." *Superior Ice Rink, Inc. v. Nescon Contracting Corp.*, 861 N.Y.S.2d 362, 365 (2d Dep't 2008). "If the determination of the parties' intent depends on the credibility of that extrinsic evidence, or a choice among reasonable inferences to be

---

[9] Nor has the supplemental briefing in this case ordered by the Court "on the historical interpretation of insurrection clauses in insurance contracts" resolved this ambiguity. Dkt. No. 167 at 2 (Court's order); *see* Dkt Nos. 170–179 (supplemental briefing and other materials in support of the briefing). One point related to the Court's supplemental briefing order is worth clarifying. In CITGO's initial supplemental brief, it opined that the Court's order itself implied that the term "insurrection" was ambiguous, "as New York law considers extrinsic evidence only as an aid in resolving ambiguity." Dkt. No. 170 at 1. That statement, however, erroneously interprets the Court's order. The Court had not determined that the contract was ambiguous at the time of its request. The Court's request for materials on "historical interpretation of insurrection clauses in insurance contracts" was not a request for extrinsic evidence; instead, it was a request for deeper briefing regarding the interpretation of the meaning of the language of the agreement. Historical legal precedents that help elucidate the meaning of later decisions are not extrinsic evidence—reviewing such precedents is the kind of legal analysis that is at the heart of our common law system. *See, e.g.*, *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001) (noting the "reasoned development of precedent that is the foundation of the common law system"). Rather—as CITGO recognizes elsewhere in its brief—the kind of extrinsic evidence that is considered in evaluating the meaning of an ambiguous contract focuses on the intentions of the parties who signed the contract at issue. *See* Dkt. No. 170 at 15–17.

drawn therefrom, then a determination of the parties' intent is to be made by a jury." *Id.* at 365–66. But if neither party adduces extrinsic evidence in discovery about the parties' intent, or if the only such evidence is "itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court." *Home Indem. Co.*, 66 N.Y.2d at 671. And in such circumstances, under the doctrine of *contra preforentem*, "any ambiguity must be resolved against the insurer"—that is, in favor of coverage. *Id.*; *see id.* at 671–72 (finding on summary judgment that where an affidavit submitted as extrinsic evidence only stated that an ambiguous term was "a term of art," that affidavit "did not supply the evidentiary facts needed to present an issue for the jury," and construing an ambiguous contract against the insurer); *Superior Ice Rink*, 861 N.Y.S.2d at 366 (noting that where no evidence was offered of "intent at the time of contracting," "the ambiguity must be resolved against the insurer" and thereby construing an ambiguous policy in favor of coverage and granting summary judgment to property owner); *Evanston Ins. Co.*, 830 N.Y.S.2d at 302–03 (2d Dep't 2007) (finding on summary judgment that where neither party submitted extrinsic evidence or "suggest[ed] that extrinsic evidence [would] aid in ascertaining [the policy's] intended meaning," the question of that meaning was "one of law for the court to determine" and construing the policy against the insurance company). Put more starkly, absent extrinsic evidence of the parties' intent that could resolve ambiguities in coverage, "[i]n order for the insurer to prevail, it must demonstrate not only that its interpretation is reasonable but that it is the only fair interpretation" of the policy. *Evanston Ins. Co.*, 830 N.Y.S.2d at 302 (quoting *Primavera v. Rose & Kiernan, Inc.*, 670 N.Y.S.2d 223, 225 (3d Dep't 1998)).

Neither party has provided extrinsic evidence about their intent when entering into the Policy that could bear on the ambiguity about whether the term "insurrection," as used in that agreement, encompassed the events in Venezuela after January 2019. As Plaintiff notes, "[t]here is no record evidence regarding CITGO's intention, if any, as to the meaning of 'insurrection' at the time it entered into the [Policy]." Dkt. No. 170 at 16. And while some of the Policy underwriters

offered limited testimony on the war risks coverage, none of that testimony focused specifically on insurrection, let alone addressed the ambiguity here—whether an insurrection can exist, such that it would be covered by the Policy, if the government being insurrected against has no *de facto* control of the country. *See* Dkt. No. 171 Ex. B at 103:5–105:20 (underwriter Gavin Wall generally discussing his understanding of war risks, but not specifically discussing insurrection); *id.* Ex. C at 134:19–135:9 (underwriter Chris McGill testifying that he did not know if there was a difference between rebellion and insurrection and not further defining insurrection).

Defendants respond not by contesting the alleged lack of extrinsic evidence, but by noting that "CITGO never asked any of Defendants' witnesses whether they would embrace" a definition of insurrection "addressed to the territorial control exercised by a targeted authority or the strength of its grip on power." Dkt. No. 178 at 11 (internal quotation marks omitted). Far from effectively responding to CITGO's argument, however, this statement is a fatal concession. Given the parties' diametrically opposed views on the meaning of "insurrection" both before and throughout this litigation, Defendants were on notice that the Court might find the term ambiguous. And New York law is clear: Once a court does so, it is the *insurer's* burden to point to meaningful extrinsic evidence on the parties' intent. *See, e.g.*, *Home Indem. Co.*, 66 N.Y.2d at 671–72. Through their statement, Defendants admit they cannot.

Thus having determined that there is no extrinsic evidence presented by the parties relevant to the Policy's ambiguity, the Court must construe those ambiguities in CITGO's favor. *See id.*; *Lend Lease*, 28 N.Y.3d at 682 ("Of course, where the policy may be reasonably interpreted in two conflicting manners, its terms are ambiguous . . . and any ambiguity must be construed in favor of the insured and against the insurer." (citations and quotation marks omitted)). Here, that means that the Court must treat the *Pan Am* definition as containing no requirement that a government hold *de facto* power for it to be insurrected against, and must read the ambiguous words in the Policy— "uprising" and "overthrow"—in a way that supports coverage.

Construing the *Pan Am* definition in that way, what happened in Venezuela after January 2019 was an insurrection. Mr. Maduro and his allies were a group engaged in a "violent uprising" because they engaged in repeated violence against members of the National Assembly to try to prevent that body from governing. Dkt. No. 151 ¶¶ 32, 36–38, 72–74; *see also Uprising*, Oxford English Dictionary (Online, Updated September 2022) (noting one definition of "uprising" as "popular rising . . . for some common purpose"). Mr. Maduro admitted that he had the "purpose of overthrowing the constituted government." Dkt. No. 151 ¶ 34 ("We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms."); *see also Overthrow*, Oxford English Dictionary (Online, Updated September 2022) (noting one definition of "overthrow" as "put[ting] an end by force to (a government, institution, etc.)"). And he acted with intent to "seize" whatever powers Mr. Guaidó was entitled to wield. *See* Dkt. No. 151 ¶ 34.

The Court therefore finds that Mr. Maduro's actions during this period constituted an insurrection within the meaning of the Policy, grants Plaintiff's motion for summary judgment on this issue, and denies in full Defendants' motion for summary judgment.

### B. Whether CITGO Owned the Cargo at Issue

CITGO has also moved for partial summary judgment on the issue of cargo ownership. Specifically, it asks the Court to dismiss Defendants' Fourteenth Affirmative Defense, which contends that CITGO "did not own the cargo that is the subject of its claim." Dkt. No. 124 at 2 (citing Dkt. No. 61 at 27). Because it is clear from the face of the Policy that CITGO indeed owned the disputed cargo when it was lost, the Court will grant this aspect of CITGO's summary-judgment motion.

The parties agree that PDVSA sold CITGO the cargo that was loaded onto the Gerd "FOB," or "Free on Board." *See* Dkt. No. 124 at 21 ("The undisputed evidence thus supports that PDVSA sold the Cargo to CITGO on an 'FOB Origin' basis"); Dkt. No. 149 at 17 ("[Defendants]

have never disputed that the Cargo was supplied to CITGO F.O.B.").  "F.O.B. or Free on Board means that title to the property passes from the seller to buyer at the designated FOB point."  *David J. Joseph Co. v. M/V BALTIC*, 64 F. App'x 259, 263 (2d Cir. 2003) (summary order) (quoting *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 843 n.2 (2d Cir. 1985)).  And CITGO and PDVSA memorialized, in a contract, exactly where the title to the cargo would pass:

> [T]itle to, and risk of loss for, all crude oil purchased under such confirmation shall pass from [PDVSA] to [CITGO] when such crude oil passes the hose flange connection for the applicable loading point / terminal / vessel / installation to the permanent cargo manifold for the vessel nominated by [CITGO].

Dkt. No. 151 ¶ 19.  In layperson's terms, CITGO and PDVSA agreed that CITGO owned the cargo once it was on CITGO's ship.  And the parties both agree that here, the cargo was lost after was all loaded onto the Gerd.  Dkt. No. 151 ¶ 9.  So CITGO's argument is simple: Under the terms of its agreement with PDVSA, it owned the cargo that was lost; as a result, the Court can—as a matter of law—reject Defendants' argument that CITGO did not own the cargo at issue in this litigation.

Defendants' respond by arguing, at length, that CITGO never paid for the cargo.  *See* Dkt. No. 149 at 17–20; Dkt. No. 156 at 7–8.  But that disputed issue is irrelevant because the issue that CITGO seeks summary judgment on is Defendants' Fourteenth Affirmative defense, which concerns whether CITGO *owned* the cargo at issue, not whether it had paid for it.  Dkt. No. 61 at 27.[10]  And on that issue, CITGO and PDVSA's agreement is clear: They determined that title to the cargo would pass once it was loaded on the Gerd.  As a

---

[10] Defendants include one line in their briefing directly addressing the material issue of cargo ownership, writing: "CITGO's contention that the status of its payment for the Cargo is irrelevant because it had title to it confuses the issue of whether PDVSA, as the unpaid supplier of the Cargo, had a superior legal right to control its disposition."  Dkt. No. 156 at 7.  The Court reads this argument to perhaps suggest that PDVSA had a superior legal title to the cargo—and thus could, in some sense, be said to "own" it despite the FOB agreement.  But Defendants provide no citation for this argument, and the Court has been unable to independently uncover any case stating that an entity, where not yet paid, can own property even where that property has been delivered under an FOB contract.  Lacking any such authority, the Court cannot credit Defendants' argument on this issue.

result, CITGO owned the cargo at issue in this litigation, and it is entitled to summary

judgment on Defendants' Fourteenth Affirmative Defense.[11]

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED IN

PART, Defendants' motion for summary judgment is DENIED, and Plaintiff's motion for judicial

notice is GRANTED IN PART.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 123, 134, and

136.

SO ORDERED.

Dated:  March 15, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[11] Defendants ultimately turn to a fairness argument on this issue, arguing that, because CITGO never paid for the cargo, any compensation it receives would be a an unjustifiable "windfall."  Dkt. No. 149 at 19.  But this is not a defense to the insurer's contractual obligation.  Defendants might pursue any subrogation rights that they have through an action for recovery against the relevant Venezuelan entity that essentially stole the cargo from CITGO.  In any event, the agreement between CITGO and PDVSA is clear that CITGO owned the cargo once it was on the Gerd—and so Defendants' Fourteenth Affirmative Defense, which states the exact opposite, must be rejected.