UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

CITGO PETROLEUM CORPORATION,
       Plaintiff,

-against-

ASCOT UNDERWRITING LIMITED (FOR AND
ON BEHALF OF THE MEMBERS OF LLOYD'S
SYNDICATE 1414), *et al.*,

       Defendants.

------------------------------------------------------------------------x

Case No. 1:21-cv-00389-GHW

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF CITGO PETROLEUM CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY OF UNDERWRITERS' WITNESS STEPHEN CHAPMAN AND EVIDENCE OF A PURPORTEDLY LEGITIMATE VENEZUELAN COURT ORDER AND FAILURE BY CITGO TO PAY FOR THE SEIZED CARGO**

# TABLE OF CONTENTS

**BACKGROUND** ........................................................................................................................ 2

      A.    Mr. Chapman's Expected Testimony Regarding the Maduro Court Order................................................................................................... 2

      B.    Mr. Chapman's Expected Testimony Regarding Alleged Nonpayment. ............................................................................................... 4

**ARGUMENT** ............................................................................................................................ 5

I.    The Court Should Preclude Mr. Chapman from Testifying as to the Origin, Validity or Effect of the Maduro Court Order.................................... 5

II.    The Court Should Preclude Mr. Chapman from Testifying that CITGO Did Not Pay for the Cargo, that there was a "Commercial Dispute" between PDVSA and CITGO, or Regarding PDVSA's State of Mind. .............. 6

III.    The Court Should Exclude the Maduro Court Order from Evidence. ................ 9

      A.    Underwriters Cannot Authenticate the Maduro Court Order.................. 9

      B.    The Maduro Court Order Is Hearsay Not Falling within Any Exception. ................................................................................................ 11

IV.    The Court Should Exclude an Email Alleging Non-Payment to a Third-Party. ......................................................................................................... 11

**CONCLUSION** ....................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Leigh*,
　471 F. Supp. 3d 540 (S.D.N.Y. 2020)...................................................................................9

*Highland Capital Mgt. L.P. v. Schneider*,
　551 F. Supp. 2d 173 (S.D.N.Y. 2008).....................................................................................8

*Jiménez v. Palacios*,
　No. 2019-0490-KSJM, 2019 WL 6915935 (Del. Ch. Dec. 17, 2019)......................................10

*King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*,
　2019 WL 1146461 (S.D.N.Y. Mar. 13, 2019)..........................................................................9

*Romanelli v. Long Island R. Co.*,
　898 F. Supp. 2d 626 (S.D.N.Y. 2012)..................................................................................6, 9

**Other Authorities**

Fed. R. Evid. 401 ...........................................................................................................................7

Fed. R. Evid. 403 ........................................................................................................................7, 8

Fed. R. Evid. 602 ...........................................................................................................................5

Fed. R. Evid. 701(c).......................................................................................................................6

Fed. R. Evid. 802 .........................................................................................................................12

Fed. R. Evid. 803(6)(E)................................................................................................................12

Fed. R. Evid. 803(8).....................................................................................................................11

Fed. R. Evid. 803(8)(B) ...............................................................................................................11

Fed R. Evid. 901 ..........................................................................................................................10

Fed. R. Evid. 901(a).......................................................................................................................9

Fed. R. Evid. Rule 902(3) ............................................................................................................10

Plaintiff CITGO Petroleum Corporation ("CITGO") respectfully moves *in limine* to preclude the Defendants (or "Underwriters") from introducing certain testimony by their claims handler, Stephen Chapman, and related documents at the upcoming trial. The Court ruled on summary judgment that CITGO owned the cargo of crude oil at issue in this lawsuit ("the Cargo"). Dkt. No. 182. Accordingly, CITGO bore the risk of loss of the Cargo, was entitled to insure it, and did so by purchasing the marine cargo policy at issue in this case ("the Policy"). Underwriters seek to use Mr. Chapman—their sole "fact" witness—to argue that CITGO did not pay for the Cargo because CITGO and its parent company, PDVSA, were embroiled in a purely commercial dispute that was resolved by a Venezuelan court order (the "Maduro Court Order"[1]) that awarded the Cargo to PDVSA. Besides being untrue, this contention is legally irrelevant and deeply prejudicial: Its only utility is to lead the jury away from the Court's determination on summary judgment that CITGO owned the Cargo. Importantly, Mr. Chapman has no personal knowledge regarding whether CITGO did or did not pay for the Cargo, whether the Maduro Court Order was legitimate, or whether there was any commercial dispute between CITGO and PDVSA. Accordingly, his testimony lacks foundation and probative value, would confuse the jury, would prejudice CITGO, and would unduly delay the trial by requiring substantially more evidence to be introduced on CITGO-PDVSA accounting issues. CITGO thus moves *in limine* to exclude certain portions of Mr. Chapman's testimony, the Maduro Court Order, and an email alleging that CITGO never paid for the Cargo.

---

[1] Two variations of the Maduro Court Order exist in the record—a one-page version and a multi-page version—both dated December 19, 2019. Underwriters have listed four instances of the order on their Exhibit List (Underwriters Exs. QQ, RR, SS, and p. 42 of Ex. AA). Each of these documents is submitted herewith as Exhibits A through D to the Declaration of John Chamberlain. CITGO's motion targets all variations of the Order, as well as any English translations thereof.

# BACKGROUND

The Cargo was seized in February 2020 by Venezuelan actors loyal to former Venezuelan president Nicolas Maduro, as part of Maduro's efforts to remain in power past his constitutional term in office. And "Mr. Maduro's action during this period constituted an insurrection within the meaning of the Policy." Dkt. No. 182, Memo. Op. & Order, at 26. At trial, CITGO will argue the seizure was part and parcel of the insurrection, or at a minimum arose from it. If permitted to do so, Mr. Chapman will put forward his lawyers' alternative theory of the case, complete with unfounded and prejudicial factual and legal opinions, as described below.

### A. Mr. Chapman's Expected Testimony Regarding the Maduro Court Order.

The Defendants have proffered only one fact witness to testify in their defense: Stephen Chapman, the Ascot claims "leader" who handled CITGO's claim on behalf of all Underwriters and personally made the decision to deny the claim. Chamberlain Decl. Ex. E, Excerpts from the Transcript of the Deposition of Stephen Chapman (hereafter "Chapman Dep.") at 108:19-109:7, 227:14-16. He explained the basis for this decision at deposition:

> [M]y understanding is that PDVSA applied to the Venezuelan courts for the cargo which they obviously believe they have a right to be discharged back to—get back into their control. And my further understanding is that the Venezuelan courts agreed with them. And the relevant authorities acting presumably under the terms of that order of the court, ah, attended the vessel, gave the details of the court order to the master and directed him to, I think, a separate port to discharge the cargo ashore.

Chapman Dep. 61:18-62:8.

Mr. Chapman couched these allegations in terms of his "understanding" and "belief." *E.g., id.* at 60:17-19 ("My understanding is that pursuant to terms of a Venezuelan court order, the master was required to discharge the cargo ashore."); at 61:3-5 ("I believe under the terms of the court order, [the ship's master] had to—he had to comply with that."); at 64:14-18 ("My belief is that in terms of the court order … they [PDVSA] approached the Venezuelan courts and asked,

you know, to receive possession back of the cargo."); at 97:20-23 ("The court order … clarifies that in the view of the Venezuelan court that the cargo—the right to the cargo rests with PDVSA.").

But when pressed for details regarding the basis for his suppositions, Mr. Chapman conceded that he lacked personal knowledge and had not conducted any factual investigation to confirm his basis for denying coverage:

> Q: Have you seen papers that were filed in [the Venezuelan] court?
>
> A: … [F]or the cargo to be ordered to be released to PDVSA or discharged ashore to their control, it was presumably an action brought by PDVSA to the Venezuelan courts. Maybe there is an assumption by me in there but … It seems reasonable to assume that they [PDVSA] … believed there was a dispute between themselves and CITGO over rights to the cargo …
>
> Q: That's what I'm trying to figure out. You're just making an assumption? You don't actually know anything about any application. But you're assuming—
>
> A: I don't know the detail of it, but—and, as I say, maybe that was an assumption by me from reading the information we did see ….
>
> \* \* \*
>
> Q: Okay. Did you ever actually conduct any investigation into whether there were actually any court proceedings?
>
> A: [] I don't recall. …
>
> Q: [] Did you ever try to get any papers that were filed in the court?
>
> A: I don't recall that, no.
>
> Q: Did you ever interview anybody at PDVSA about this issue?
>
> A: I did not interview anybody, no.
>
> Q: Did anybody? Did somebody interview them?
>
> A: [] I'm not aware of any such interview.
>
> Q: Did anybody try to pull any documents from the court, the Venezuelan court, with respect to this issue?
>
> A: [] I'm not aware of that. …

3

*   *   *

> Q: [D]o you know if CITGO was permitted to be at those court proceedings before that order was issued?
>
> A: I have no knowledge of that.
>
> Q: Do you actually know if there were any proceedings at all?
>
> A: I don't know the detail of that, no.
>
> Q: And you didn't conduct any investigation to determine that?
>
> A: No, we didn't ….

Chapman Dep. at 64:21-69:20.

Mr. Chapman, a non-Spanish speaker, could not recall ever seeing an English translation of the Maduro Court Order. *Id.* at 223:9-224:10. Mr. Chapman ultimately conceded that it was possible the Maduro regime solicited the Maduro Court Order by instructing the Venezuelan court to issue it. *Id.* at 221:2-21.

### B. Mr. Chapman's Expected Testimony Regarding Alleged Nonpayment.

Mr. Chapman also admitted at deposition that he had no personal knowledge regarding whether CITGO paid for the Cargo through offsets (Chapman Dep. at 204:24-205:12) and that he could not recall conducting any investigation into an alleged contractual dispute between CITGO and PDVSA regarding payment (*id.* at 197:3-198:12).[2] Nonetheless, Defendants' lawyers have

---

[2] In fact, the only percipient witnesses in the case with personal knowledge of the transaction testified that CITGO did pay for the Cargo. Those witnesses explained that CITGO engaged in regular and recurring in-kind transactions with PDVSA, in which PDVSA provided crude oil to CITGO in exchange for goods and services of equivalent value (including refined petroleum products, transportation costs, and other services and expenses). CITGO and PDVSA kept a running ledger of credits and debits owed for the goods exchanged, using the value of the products and services swapped as the medium of exchange. Chamberlain Decl. Ex. F, Excerpts of Transcript of Deposition of Gina Coon ("Coon Dep.") at 67:12-18, 68:15-70:6. CITGO assigned each transaction a "nomination number" or "NOM #" for tracking and accounting purposes. On January 1, 2019, the presidents of CITGO and PDVSA executed a letter agreement for NOM #102189, under which CITGO purchased the Cargo in exchange for offsets against amounts owed to CITGO. Chamberlain Decl. Ex. G at 16. Applying these offsets left a balance of $1,270,523 that PDVSA owed CITGO. *Id.* at 36.

4

argued that CITGO never paid PDVSA for the Cargo. *E.g.*, Dkt. No. 149 at 17 ("CITGO never paid PDVSA for the Cargo because sanctions were imposed by the United States on PDVSA …").

**ARGUMENT**

**I.      The Court Should Preclude Mr. Chapman from Testifying as to the Origin, Validity or Effect of the Maduro Court Order.**

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. This rule is a manifestation of "the common law insistence upon the most reliable sources of information." *Id.*, 1972 Advisory Committee Notes (internal quotation marks omitted). All of this prevents a witness from simply acting as a mouthpiece for lawyers who present his testimony.

Mr. Chapman has no personal knowledge regarding the provenance or legal effect of the Maduro Court Order. All Mr. Chapman knows is that a PDVSA representative handed to the Gerd's master a document purporting to be a court order—and even that minimal information he obtained through the hearsay statements of others. *See supra*, § A.

Against this backdrop, the Court should preclude Mr. Chapman from testifying that the Maduro Court Order was legitimately issued, is valid, or that the order gave PDVSA a legal right to seize the Cargo. Mr. Chapman should not be allowed to testify—as he did at deposition—that "PDVSA applied to the Venezuelan courts for relief," that the "Venezuelan courts agreed with" PDVSA's position, or that Venezuelan authorities "acting … under the terms of that order" escorted the Gerd into port to discharge the Cargo. Chapman Dep. 61:18-62:6. In fact, the purported order does not mention CITGO, does not mention a dispute involving CITGO, and does not mention or address any purported position taken by PDVSA. *See* Chamberlain Decl. Ex. A (Spanish and unofficial English translation of short-form order) & Ex. C (unofficial English translation of long-form order). Mr. Chapman—who could not recall ever reading the Maduro

5

Court Order—should not be permitted to testify that "the court order g[ave] possession of the cargo to PDVSA," or that the order "clarifie[d] that in the view of the Venezuelan court that … the right to the cargo rests with PDVSA." Chapman Dep. at 65:19-66:2, 97:20-23. Nor should Mr. Chapman be permitted to testify that the ship's master had to comply with the court order or risk being subjected to "sanctions from that court." *Id.* at 90:13-18.

Mr. Chapman lacks any personal knowledge of these matters, and he should not be permitted to express factual or legal opinions about such matters as he is not testifying as an expert. Mr. Chapman is a lay witness who did no investigation, could not recall whether he reviewed the Maduro Court Order before denying CITGO's insurance claim, and does not even understand the language in which that document was written. *See* Fed. R. Evid. 701(c) (lay witness may not testify to matter that requires "specialized knowledge."); *Romanelli v. Long Island R. Co.*, 898 F. Supp. 2d 626, 633 (S.D.N.Y. 2012) (excluding testimony of lay witness where opinions required scientific or specialized knowledge).

**II.     The Court Should Preclude Mr. Chapman from Testifying that CITGO Did Not Pay for the Cargo, that there was a "Commercial Dispute" between PDVSA and CITGO, or Regarding PDVSA's State of Mind.**

Mr. Chapman also should not be permitted to testify that there was a "commercial dispute" between PDVSA and CITGO because CITGO allegedly failed to pay for the Cargo. *E.g.*, Chapman Dep. at 202:16-19 ("There is a commercial dispute between PDVSA and CITGO. And … that is the underlying reason [for] the ship being, um, kept in Venezuelan waters."); *id.* at 235:9-14 ("[T]his whole situation was driven by a commercial dispute between PDVSA and CITGO, and that commercial dispute led to a court order being issued by the Venezuelan courts and the cargo was discharged ashore pursuant to the terms of that court order.").

Once again, Mr. Chapman has no personal knowledge of the purported "commercial dispute" arising from non-payment for the Cargo:

6

> Q: Are you aware that … there was actually a credit owed CITGO per [its agreement with PDVSA], and when the [] crude oil that's at issue here was loaded onto the Gerd, that was actually in payment of a credit that was already owed CITGO? Are you aware of that?
>
> A: I'm aware of that … being brought forward by CITGO.
>
> Q: Okay. And you don't have any reason to doubt that; right?
>
> A: I can't comment.[3]

Chapman Dep. at 204:24-205:12. Without foundation, Mr. Chapman should not be permitted to testify about any alleged non-payment issues or any alleged commercial dispute between CITGO and PDVSA over non-payment. Fed. R. Evid. 401.

Moreover, even if Mr. Chapman properly could testify on these issues, any allegation that CITGO failed to pay for the Cargo would be inadmissible under Rule 403 because its probative value (if any) is substantially outweighed by the danger of confusing the issues and misleading the jury given the Court's prior ruling in this case. This is an insurance dispute and under the Policy, coverage for a loss is predicated on ownership of the Cargo, not payment. The Policy's "Attachment and Termination of Cover" provision states that "[t]he insurance hereunder attaches from the time the subject matter becomes at the Assured's risk." Dkt. No. 75-1 at 6 of 39.[4] At deposition, Mr. Chapman acknowledged that to prevail on its insurance claim, CITGO only needed to demonstrate that it *owned* the Cargo—not that it *paid* for the Cargo:

> A: The burden here is on the insured to show that there was an insured peril operating that caused the loss, the alleged loss.
>
> \*     \*     \*

---

[3] Mr. Chapman frequently used the phrase "I can't comment" as the equivalent of "I have no knowledge." *E.g.*, Chapman Dep. at 221:11-21 (Q: "It is possible that, actually, the court that issued [the Maduro Court Order] was instructed to do so?" A: "I can't comment." Q: "Right. Because you didn't conduct any investigation into this issue and so you can't comment; correct?" A: "Yes.").

[4] Similarly, the Institute War Clauses state that the insurance "attaches only as the subject-matter insured and as to any part as that part is loaded on an oversea vessel." Dkt. No. 75-2 at 10 of 12, § 5.1.1. Whether the subject-matter insured has been *paid for* is irrelevant.

7

| | | |
|---|---|---|
| Q: | | What would be sufficient to meet the burden in your mind? If you wanted to be satisfied that CITGO had met its burden, what would you have wanted to see? |
| A: | | Well, **they'd have to show that they were the legitimate owner of the cargo.** |
| Q: | | How would they establish that in your mind? |
| A: | | They would have to provide evidence that … whatever the law and jurisdiction applicable to the contract under that law and jurisdiction that they were the legitimate owner of the cargo at the time that it was—at the time when they are alleging the loss occurred. |

Chapman Dep. at 228:22-24, 229:12-230:3 (emphasis added). Subsequently, this Court held that CITGO *did own* the Cargo—which, as demonstrated above, both the Policy and Mr. Chapman agree is dispositive. *See id.*

Any suggestion that CITGO failed to pay for the Cargo would merely confuse the issues of ownership (relevant) and payment (irrelevant).[5] It would suggest to the jury that CITGO did not own the Cargo, even though the Court has ruled otherwise. This is unfairly prejudicial. Furthermore, it would mislead the jury, and result in undue delay and the wasting of the Court and jury's time. Fed. R. Evid. 403; *Highland Capital Mgt. L.P. v. Schneider*, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008). If Underwriters are permitted to argue that CITGO did not pay for the Cargo, CITGO will be forced to introduce more extensive CITGO-PDVSA accounting records and detailed witness testimony to prove that CITGO did, in fact, pay for the Cargo. This exercise would be unnecessary and time-consuming.

For the same reasons, Mr. Chapman should not be permitted to testify about what PDVSA purportedly "believed." *E.g.*, Chapman Dep. at 61:18-21 (PDVSA "obviously believe[d] they ha[d] a right" to the Cargo) *id.* at 65:12-14 (PDVSA "believed there was a dispute between

---

[5] Any dispute over non-payment for the Cargo would be an issue between CITGO and PDVSA. The Crude Supply Agreement provides a remedy for such disagreements: arbitration. Dkt. No. 127-9, Crude Supply Agreement at 113 of 42, ¶ 16. It is undisputed that PDVSA never availed itself of this contractual (*e.g.*, commercial) remedy.

8

themselves and CITGO over rights to the cargo"). Mr. Chapman does not have personal knowledge of others' beliefs, nor did he interview a single PDVSA representative in relation to CITGO's claim. Chapman Dep. at 234:15-19; *see also Romanelli*, 898 F. Supp. 2d at 633 (excluding testimony of lay witness who lacked personal knowledge); *King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*, 2019 WL 1146461 at *2, n.3 (S.D.N.Y. Mar. 13, 2019) (witness lacked personal knowledge where testimony was based entirely on "something that someone told" the witness); *Abraham v. Leigh*, 471 F. Supp. 3d 540, 554 (S.D.N.Y. 2020) (declarant could not offer admissible testimony about facts he "could have only learned from others").

### III. The Court Should Exclude the Maduro Court Order from Evidence.

Underwriters have indicated that they intend to introduce the Maduro Court Order as evidence for the truth of its contents. Moreover, it appears they intend to offer it as evidence for a conclusion the Maduro Court Order itself does not state. Underwriters argued on summary judgment that "[t]he Cargo was removed from the Vessel because of a Venezuelan Court Order determining PDVSA was entitled to 'restitution' of the Cargo, due to CITGO's non-payment." Dkt. No 149 at 12 (citing Dkt. No. 139-25, unofficial English translation of Maduro Court Order). Again, this is rife with the prejudicial suggestion, contrary to this Court's ruling, that CITGO did not lawfully own the Cargo. Additionally, nothing in the purported Maduro Court Order mentions CITGO or asserts that it did not pay for the Cargo. Chamberlain Decl. Ex. C. Even setting this aside, the order is inadmissible for multiple reasons.

#### A. Underwriters Cannot Authenticate the Maduro Court Order.

The proponent of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Underwriters cannot meet this burden. They cannot prove the document is what they claim it to be, *i.e.*, a legitimate court

document issued by a legitimate court having jurisdiction over the Cargo. Underwriters have proffered no legal expert on this issue; no party to this case was present at any court proceedings precipitating the Maduro Court Order; and no party has designated any witness with first-hand knowledge of how the document was generated, including whether it was actually generated by a court. Underwriters will be able to demonstrate, at best, that the document was handed to the ship's master by a person purporting to be a lawyer and PDVSA representative. Chamberlain Decl. Ex. B.[6]

The authenticity of the document is no idle question. PDVSA was previously ordered by the Delaware Chancery Court to withdraw a forged directive purporting to have been issued by CITGO's Board of Directors. *See* Dkt. No. 126, CITGO Rule 56.1 SOF, ¶¶ 68-69; *Jiménez v. Palacios*, No. 2019-0490-KSJM, 2019 WL 6915935, at *1 (Del. Ch. Dec. 17, 2019) (condemning PDVSA's fraudulent tactics). It is entirely possible the Maduro Court Order also was a forgery, much like the fraudulent CITGO Board resolution that PDVSA served on the ship's master just weeks earlier.

Rule 901's authentication requirement is intended to prevent documents of dubious origin being relied upon as evidence. That rule squarely applies here and prohibits the introduction of the Maduro Court Order into evidence.

---

[6] Rule 902(3) provides that Foreign Public Documents may be self-authenticating under certain circumstances not present here. "The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester—or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States." Fed. R. Evid. 902(3).

### B. The Maduro Court Order Is Hearsay Not Falling within Any Exception.

Additionally, the order cannot be relied upon for the truth of its contents because it is hearsay not falling within any exception. Underwriters cannot rely on the Public Records exception of Rule 803(8), because they have no way to prove that the document is, in fact, a public record, rather than a PDVSA forgery. Moreover, the Public Records exception does not apply if the opponent of the evidence "show[s] that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B).

Here, the Maduro Court Order lacks trustworthiness. CITGO's expert, Dr. Sarmiento-Sosa, has testified that the court—a criminal court sitting in Venezuela's capital, Caracas—lacked jurisdiction to adjudicate the ownership of the Cargo, which was situated in a different Venezuelan state and was subject to the jurisdiction of maritime courts, not criminal courts. Dkt. No. 133, Decl. of Carlos Sarmiento Sosa ¶¶ 113-15. Moreover, CITGO did not receive notice and an opportunity to be heard before the issuance of an order that purported to divest CITGO of nearly $50 million of CITGO's property. Indeed, the Maduro Court Order does not even *mention* CITGO. These are not indicia of trustworthiness—they are the hallmarks of a court under the thumb of a dictator. The purported court order lacks legitimacy on its face, and Underwriters should not be permitted to rely upon it as evidence that PDVSA was justified in seizing the Cargo.

### IV. The Court Should Exclude an Email Alleging Non-Payment to a Third-Party.

PDVSA never asserted to CITGO that CITGO had not paid for the Cargo; rather, PDVSA promised to verify CITGO's accounting of the applicable offsets, but never did so. Chamberlain Ex. I, Schmidt Dep. at 137:20-138:19. However, on June 28, 2019, a PDVSA representative named Oswaldo Vargas emailed the Gerd's owner, Knutsen Shuttletanker Pool AS, and asserted to Knutsen that CITGO had not paid for the Cargo. Chamberlain Decl. Ex. J (the "Vargas Email").

Underwriters have indicated that they intend to rely on the Vargas Email for the truth of its contents—*i.e.*, as evidence that CITGO did not, in fact, pay for the Cargo. Dkt. No. 141, Underwriters' Rule 56.1 SOF, ¶ 36 (citing the email as evidence that "CITGO had not paid" for the Cargo[7]). But the rule against hearsay forbids the introduction of this email statement. Fed. R. Evid. 802. Although the email string itself is a CITGO business record, the business record exception to the hearsay rule does not apply where the opponent of the evidence "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). Here, both the source of the information and the surrounding circumstances indicate a lack of trustworthiness. PDVSA demonstrated a willingness to engage in fraud when it presented the master of the Gerd with a falsified directive from CITGO's "board." And the fact that PDVSA asserted that CITGO had not paid only to a third party, but never to CITGO, indicates a lack of veracity. PDVSA's representatives sought to mislead third parties rather than address this issue with CITGO itself. This false statement cannot be relied upon for the truth of its contents.

**CONCLUSION**

For the foregoing reasons, the Court should issue an order (i) precluding Stephen Chapman from testifying about the existence, provenance or legal effect of the Maduro Court Order; (ii) precluding Stephen Chapman from testifying that the Cargo was seized due to non-payment or due to a "commercial dispute" between CITGO and PDVSA, or regarding PDVSA's "beliefs"; (iii) excluding the Maduro Court Order from evidence; and (iv) excluding the Vargas email from evidence.

---

[7] Underwriters' Exhibit List includes two instances of the Vargas email: Exhibit EE, and page 6 of Exhibit AA.

Dated: September 19, 2023

                Respectfully submitted,

                /s/ *David F. Klein*

David F. Klein
david.klein@pillsburylaw.com
Mark J. Plumer
mark.plumer@pillsburylaw.com
John Chamberlain
john.chamberlain@pillsburylaw.com
Jeffrey Mikoni
jeffrey.mikoni@pillsbury.com
Pillsbury Winthrop Shaw Pittman LLP
1200 17th Street NW
Washington, DC 20036
(202) 663-8000

Richard P. Donoghue
richard.donoghue@pillsburylaw.com
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019
(212) 858-1000

*Counsel for CITGO Petroleum Corporation*