UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

CITGO PETROLEUM CORPORATION,

              Plaintiff,

   -against-

ASCOT UNDERWRITING LIMITED (for and on
Behalf of Lloyd's Syndicate 1414), et al.,

              Defendants.

-------------------------------------------------------------------x

Case No. 1:21-cv-389-GHW

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

    I.     Underwriters Ignore the "Arising From" Causation Standard under New York Law. ............................................................................................................................. 1

    II.    Underwriters' Arguments About "Direct" and "Indirect" Causation Misstate and Ignore Key Facts. ................................................................................................. 4

    III.   CITGO's Recovery Should Be Calculated Under the International Transit Provision of the Loss Valuation Clause. ...................................................................... 8

    IV.   CITGO's Demurrage, Attorneys' Fees and Other Expenses Are Covered. ................. 9

CONCLUSION .................................................................................................................... 10

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*California v. Hodari D.*,
    499 U.S. 621 (1991)...................................................................................................1

*Greene v. Pac. Mut. Life Ins. Co.*,
    91 Mass. 217 (1864) ...............................................................................................2

*Kondjoua v. Barr*,
    961 F.3d 83 (2d Cir. 2020)......................................................................................3

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Rep. of China*,
    254 F.2d 177 (4th Cir. 1958) ..................................................................................2

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
    505 F.2d 989 (2d Cir. 1974)..............................................................................2, 3, 9

*Pape v. Home Ins. Co.*,
    139 F. 2d 231 (2d Cir. 1943)...................................................................................3

*United States v. Hill*,
    890, F.3d 51 (2d Cir. 2018).....................................................................................3

*United States v. Mendenhall*,
    446 U.S. 544 (1980).................................................................................................2

*United States v. Nikolla*,
    950 F.3d 51 (2d Cir. 2020)......................................................................................3

<u>Statutes and Codes</u>

United States Code
    Title 18, section 16(a) .............................................................................................3

N.Y. Penal Code
    Section 7.02.............................................................................................................3

<u>Rules and Regulations</u>

Executive Order No. 13,807, 82 Fed. Reg. 41,144, 2017 WL 370437 (Aug. 24, 2017) .................4

Executive Order No. 13,857, 84 Fed. Reg. 509 (Jan. 25, 2019).........................................4

<u>Other Authorities</u>

46 C.J.S. Insurance § 1452.................................................................................................2

J. Gilman, et al., Arnould Law of Marine Insurance & Average (20th ed. 2021) ..........................3

## INTRODUCTION

CITGO's Pretrial Memorandum (Dkt. No. 193) ("Tr. Mem.") began by noting what the Court has already decided and then focused on the issues that remain to be tried. Conversely, Underwriters' Opposition (Dkt. No. 220) ("Opp'n") seeks to undo the Court's earlier rulings and relitigate the law of the case. Underwriters seek to marginalize the Court's summary judgment finding that an insurrection occurred (Dkt. No. 182) by rearguing the test for an insurrection and, absurdly, construing the Court's ruling as limited to events postdating the examples CITGO called to the Court's attention in its motion. Along the way, Underwriters seek to read the "arising from" language out of their policy and to ignore New York law governing its construction; misstate or ignore key facts, including those already admitted; and suggest that CITGO has conceded facts that are hotly disputed and must be resolved at trial. Finally, without citing authority and eliding over relevant facts, they urge a crabbed construction of the monetary relief their policy provides.

## ARGUMENT

**I.    Underwriters Ignore the "Arising From" Causation Standard under New York Law.**

Underwriters' memorandum sidesteps CITGO's arguments about the causation standard. The Institute War Clauses grant coverage for loss "caused by" a "seizure" "arising from" an "insurrection …."  Underwriters seek to expand the "caused by" requirement and to eliminate the "arising from" requirement.  But it cannot seriously be disputed that CITGO's loss was "caused by" the seizure of its Cargo in satisfaction of subsection 1.1.[1]  The question for trial is whether, pursuant to subsection 1.2, the seizure was one "*arising from … an insurrection ….*"

---

[1]  In a footnote, Underwriters take a stab at arguing there was no seizure, but they do not contend the property was not taken from CITGO.  Opp'n. at 7 n.3.  Both the Supreme Court and authorities construing marine insurance have made clear that a seizure of property is a "taking possession." *California v. Hodari D.*, 499 U.S. 621, 624 (1991);

Underwriters seek to evade the policy's New York choice of law clause and to escape the cascade of New York insurance decisions CITGO has cited (Tr. Mem. at 8-9) that provide a liberal causation standard for "arising from"—distinguished from proximate cause and equating to but-for causation—by arguing, first, that none of the New York cases specifically involved marine cargo insurance, and second, that the Court should apply English law. Opp'n at 2-3. These are invitations to error. Underwriters cite no New York case suggesting the phrase "arising from" in an insurance policy depends on the type of policy at issue, because there is none. And this policy is to be construed under New York law, not English law. That choice of law was written into the policy by Underwriters and reflects an intention to adopt the construction of New York decisional law.

The only case Underwriters cite applying New York law is *Pan Am*, which made clear that insurance policies are to be construed in the manner "most beneficial to the insured," did not involve a policy with "arising from" language, and specifically noted that if the parties wanted to use a different causation standard, they could have used different language. *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 999, 1007 (2d Cir. 1974). Here, Underwriters chose New York law and used causation language that New York courts have long equated to but-for causation.

Underwriters next argue at length, again without citing any authority, that the act which resulted in the seizure of the Cargo must itself be violent to trigger coverage. Opp'n at 4-7. The

---

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Rep. of China*, 254 F.2d 177, 184 (4th Cir. 1958); *Greene v. Pac. Mut. Life Ins. Co.*, 91 Mass. 217, 2020 (1864); 46 C.J.S. Insurance § 1452. Underwriters respond by citing *United States v. Mendenhall*, 446 U.S. 544 (1980), which only discussed the custodial seizure *of a person*. At any rate, *Mendenhall* cited "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" as examples of conduct constituting a seizure. *Id.* at 555. Even these criteria would be satisfied here.

opposite is true. The "arising from" test mandated under New York law makes this clear. The policy requires that the loss arise from an insurrection, not "insurrectionary violence." Underwriters' argument depends on the notion that every aspect of an insurrection is violent, and what is not violent is not part of the insurrection. There is no basis for such a conclusion. An insurrection may involve speech and coordination, as well as physical acts. The law understands violence itself to include both actual and threatened uses of force.[2] The determinant of insurrection is the intent to displace constituted authority, *Pan Am*, 505 F.2d at 1018, and the measures taken by the Maduro regime and its supporters were to effectuate that intention.

Underwriters' argument also collides with longstanding Second Circuit precedent. In *Pape v. Home Ins. Co.*, a "Labor Committee" without official status seized cotton from public warehouses during the Spanish Civil War. 139 F. 2d 231, 233 (2d Cir. 1943). The committee notified the warehouses of the seizure but did not physically remove the cotton. *Id*. at 234. Given the implicit threat of violence, the absence of physical force did not defeat coverage: "[T]his committee took control … with sufficient display of strength so that every one acquiesced in its power. A testing of that strength by resistance, even to the point of bloodshed … was surely not necessary." *Id*.; *see also* J. Gilman, et al., Arnould Law of Marine Insurance & Average at 1263 n.172 (20th ed. 2021) (for a "seizure" under Institute War Clauses, "there need be no actual

---

[2] *See, e.g., Kondjoua v. Barr*, 961 F.3d 83, 89 (2d Cir. 2020) ("proof of actual physical violence is not required" for "crime of violence" and threats are sufficient; explaining that "menacing conduct … is sufficient to establish the threat of physical force," and "persons who purport . . . to wield the state's coercive authority can communicate a threat of force.") (some ellipses and internal quotation marks omitted); *United States v. Nikolla*, 950 F.3d 51, 53 (2d Cir. 2020) ("threaten[ing] physical violence to any person or property" is a "crime of violence"); *United States v. Hill*, 890, F.3d 51, 59 (2d Cir. 2018) (explaining that "That's a nice car – would you like to be able to continue driving it?" constitutes the application of force because it implicitly threatens violence). *See also* 18 U.S.C. §16(a) ("crime of violence" includes "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another"); N.Y. Penal Code §7.02 ("violent felony offenses" include, *inter alia*, "intimidating a victim or witness," "menacing a police officer or peace officer," and "stalking," all as defined by other penal provisions).

violence shown, nor any resistance") (construing English law).

CITGO will show at trial that the Maduro regime seized the Cargo to deprive CITGO, an instrumentality controlled by the legitimate government, of an asset worth tens-of-millions of dollars; that it did so in defiance of the explicit directive of the legitimate government; and that this act was carried out under the barrels of a navy gunship, with the clear threat of force.

## II.   Underwriters' Arguments About "Direct" and "Indirect" Causation Misstate and Ignore Key Facts.

 Underwriters' arguments that CITGO can show neither "direct" nor "indirect" causation misapprehend the record. They characterize the testimony of the masters of the Gerd as proof that the Maduro parties deployed no force, and argue that the navy gunship participated only to help the vessel get safely to harbor. This selective reading requires a willful erasure of much of the masters' testimony. The deposition testimony of the masters that CITGO has designated for trial establishes that the very presence of a military vessel shadowing the Gerd for months was unprecedented in the masters' experience, and threatening; that it was the presence of the gunship that convinced the master to surrender the Cargo; and that he did so only under protest. It also shows that, while Venezuelan military personnel removed their arms before boarding the Gerd on one occasion, those who boarded to seize the Cargo remained armed for the encounter.

It is also incorrect to argue, as Underwriters do, that no new sanctions were imposed because of the insurrection. While the United States had already imposed sanctions on the Maduro regime because of its violent attempts to suppress the National Assembly (Exec. Order. No. 13,807, 82 F.R. 41,144, 2017 WL 370437 (Aug. 24, 2017); SOF ¶ 35), as the Court noted on summary judgment, the United States on January 25, 2019 imposed new and additional sanctions, including sanctions against PDVSA, "in light of actions by persons affiliated with the illegitimate Maduro regime, including . . . continued attempts to undermine the Interim President of Venezuela

and [ ] the National Assembly . . . from exercising legitimate authority in Venezuela." Order at 4-5 (Dkt. No. 182) (*citing* E.O. 13857, 84 Fed. Reg. 509 (Jan. 25, 2019) and SOF ¶ 47). Underwriters' suggestion—that these references to an "illegitimate" regime "undermin[ing]" the legitimate president and preventing the legislature from exercising legitimate authority were not references to the insurrection—defies logic and is not credible. These are express references to the displacement of legitimate authority, and that is how the Court cited them. Likewise, Underwriters' suggestion (Opp'n at 14) that the U.S. President imposed sanctions as a matter of unfettered discretion and without purpose is false—U.S. Government statements on the record show otherwise. SOF ¶¶ 47-48 (adding PDVSA in light of Maduro attempt to prevent legitimate government from exercising authority).   At any rate, this argument does not show the President was not responding to an insurrection; the opposite is obvious to everyone except Underwriters.

Underwriters claim the insurrection itself did not start until February 2019 because the Court used the words "after January 2019" in its order on summary judgment. This ignores the events the Court described in its ruling, including physical attacks on the National Assembly, the end of Maduro's lawful term, the inauguration of President Guaidó, and acts of violence against the legislature and the public. *See generally* Order at 2-5, 6-7. At bottom, Underwriters are seeking to turn a sow's ear into a silk purse by misreading the Court's opinion.

Similarly, Underwriters' argument that the seizure arose solely from a "commercial dispute" between CITGO and PDVSA depends on a misconstruction of the record. While Underwriters offer record citations for many subsidiary statements in their argument, their key contentions are conclusory, disputed, and unsupported by the record. Key examples follow.

"Importantly," Underwriters state, "CITGO does not dispute that the sanctions made it impossible for CITGO to remit payment for the Cargo to PDVSA." Opp'n at 16. But CITGO

disputes this vigorously. All the evidence is that CITGO paid for the Cargo through offsets. Tr.

Mem. at 13-14. CITGO normally paid for crude by delivering product to PDVSA, and the January

2019 transaction was no exception.  Contemporaneous documents that pre-date the sanctions prove

that both CITGO and PDVSA pre-approved a package of offsets for the Cargo—and thus the form

of payment by offsets was settled before delivery.[3]

Underwriters claim "[t]he Cargo was not released because PDVSA considered that it had

not received payment for it." Opp'n at 16-17. Underwriters go on to cite record references

concerning every communication between CITGO and PDVSA from the loading of the Cargo to

CITGO's notification in late February that it would not offload the Cargo. *Id*. at 17. But they cite

no evidence—none—for what "PDVSA considered." This is because there was *no statement* from

PDVSA to CITGO—*ever*—that CITGO did not pay for the Cargo. This is a theory about PDVSA's

contemporaneous state of mind for which Underwriters have no evidence.[4]

Underwriters contend that "CITGO and PDVSA both accepted that the imposition of the

sanctions meant the transaction of the Cargo would need to be cancelled[.]" Opp'n at 17. Again,

they cite nothing to support this hotly disputed fact—either concerning CITGO's view or

PDVSA's. And likewise, they cite nothing for their proposition that "CITGO started telling

PDVSA that the inability to pay PDVSA that arose from the U.S. sanctions that had been the entire

---

[3]  Underwriters' assertion that CITGO has "changed its story of payment" is wrong. CITGO has stated from the outset that it paid for the Cargo through the pre-contracted medium of exchange: product for crude. The January delivery of product aboard the Mambo and Bellatrix was exactly what that the presidents of PDVSA and CITGO designated as payment for CITGO's crude delivery in their January 1, 2019 letter agreement. That the product was forcibly taken does not alter that it was delivered to be exchanged and that PDVSA received it. Nor is it correct that Underwriters did not insure the product cargoes of the Mambo and Bellatrix: their "open cargo" policy applied to all shipments for which CITGO bore the risk, including the cargoes of both vessels until they were received by PDVSA.

[4]  The fact that, long afterwards, PDVSA claimed to a third party that CITGO never paid for the Cargo, but never made this accusation directly to CITGO, does not establish a "commercial dispute" between PDVSA and CITGO. It reinforces PDVSA's duplicity in attempting to mislead the master into surrendering the Cargo.

reason for cancelling the Cargo in the first place was no impediment at all ….” Opp’n at 18. CITGO never took the position that it had not paid for the Cargo, because it is untrue.

Underwriters state, “PDVSA refused to agree that the offsets cited by CITGO constituted payment for the Cargo” and “[t]his refusal was the reason why Venezuelan port authorities would not let the Vessel sail, and it remained at anchor for nearly a year.” *Id*. Again, Underwriters cite nothing for PDVSA’s or the port authorities’ state of mind. In reality, PDVSA “refused” nothing: it never responded to CITGO at all, despite CITGO’s repeated requests for a response.

Underwriters contend “CITGO’s purchase of the Cargo from PDVSA was made pursuant to a Sales Contract that required a cash payment in U.S. dollars to be made for sales of crude oil, including the Cargo.” *Id*. at 19. And: “PDVSA never gave its agreement to the offsets CITGO proposed as payment for the Cargo, and there is no provision of the Sales Contract that would allow CITGO to circumvent its obligation to pay cash for the Cargo by paying for it through an offset imposed unilaterally, and in the absence of PDVSA’s agreement.” *Id*. at 20. To the contrary, CITGO already has cited the Petromar contract which specifically authorized such offsets (Tr. Mem. at 13 & n.8), and the written January 1, 2019 agreement between the presidents of PDVSA and CITGO which—consistent with their monthly practice over many years—specifically approved the January offsets. *Id*. at 14.

As to the Caracas criminal court order, Underwriters assert “CITGO was well aware of the Court Order at this time, but made no effort to object to or to appeal the decision ….” Opp’n at 20. Again, they cite no evidence of CITGO’s knowledge. In fact, CITGO was never served and was not even a party to the criminal proceeding, which was initiated *ex parte* solely against the Gerd’s master. (Nor was CITGO mentioned or any dispute with PDVSA referenced, much less decided.) Moreover, CITGO’s witnesses will testify it would not have been safe to appear in Caracas to

challenge the criminal court's action: six CITGO executives had already been detained in Venezuelan prison cells for several years. Additionally, an appeal would have been fruitless as the Cargo seized from the Gerd was long gone—sold to third parties immediately after it was seized.

### III.   CITGO's Recovery Should Be Calculated Under the International Transit Provision of the Loss Valuation Clause.

Underwriters contest which provision of the Basis of Valuation and Loss Settlement Clause applies to CITGO's loss. That clause provides that, for "International Transits," Underwriters must pay "Invoice value plus carriage and other charges as incurred plus duty paid and/or as payable plus 10%." CITGO's shipment of crude oil was indubitably in international transit from Venezuela to Aruba. A separate provision of the clause specifies that, for "Intercompany Transits," the Policy pays "Cost of replacement plus all charges incurred." Underwriters claim the loss was an "Intercompany Transit" and that this clause trumps the "International Transits" clause. They cite no authority for this interpretation.

The Policy does not define "Intercompany Transits." But Underwriters do not dispute CITGO's statement that, in industry usage, "Intercompany Transits" refers to transits *within* a company (*see* Tr. Mem. at 18 n.11). Here, the Named Insured under the Policy was CITGO, not PDVSA. It is with respect to CITGO, the Named Insured, that the meaning of intra-company must be understood. The fact that PDVSA was CITGO's corporate parent does not make it the same company. In doing business with PDVSA, CITGO was transacting outside the scope of the "company" covered by the Policy, and thus contracting an *extra-company* transit. Indeed, it dealt with PDVSA at arms'-length, negotiating prices on a monthly basis.

Even if this were not so, the provision's ambiguity would militate in favor of greater coverage. The Clause does not specify what happens when a loss involves a transit that is *both* "International" *and* "Intercompany." Underwriters' argument presupposes that if a transit qualifies

as "Intercompany," that supersedes its status as "International," but nothing in the Policy says this. And where such ambiguity exists, New York law provides that the construction maximizing coverage should be applied. *Pan Am*, 505 F.2d at 999.[5]

## IV.  CITGO's Demurrage, Attorneys' Fees and Other Expenses Are Covered.

Underwriters seek to escape their obligations to cover CITGO's ancillary costs under the Demurrage, Sue and Labour, and Forwarding Expenses Clauses by eliding over the facts supporting CITGO's claim for such coverage.

They argue that demurrage is not available because, they contend, CITGO's action was not "required by the actions of the underwriters or their agents," as the Demurrage Clause specifies. Opp'n at 22-23. But CITGO already has shown otherwise. Underwriters did not "merely remind[] CITGO of its obligations as a prudent uninsured," as they now contend. When the Gerd was immobilized but not yet seized, CITGO and Underwriters engaged in an extensive correspondence about CITGO's claim for coverage. Underwriters contended that CITGO was not yet entitled to coverage because its Cargo was not yet lost. It was in that context that their counsel warned CITGO of its "duty" to "take all necessary steps to preserve the cargo from loss or damage." CITGO properly understood it risked forfeiting coverage if it failed to heed that warning.

As to the Sue and Labour Clause, Underwriters urge that it only applies to losses "arising from a peril covered hereunder." Opp'n at 24. They contend CITGO's loss does not arise from an insurrection, so the Sue and Labour Clause does not apply. *Id.* But because the seizure did arise from an insurrection, this coverage does apply. And as CITGO will show, none of its expenses were "regular maintenance"; they were necessary to avert an imminent loss.

---

[5]  Underwriters' position is also inconsistent. For loss valuation purposes, Underwriters treat CITGO and PDVSA as the same company. It is nonsensical to argue that a company could have a "commercial dispute" with itself.

Underwriters urge that the Forwarding Expenses Clause does not apply because CITGO's attempts to release, store, and procure the onward shipment of the Cargo were unsuccessful. Opp'n at 24-25. Underwriters simply ignore CITGO's argument (Tr. Mem. at 23) that the Clause expressly applies to voyages that are "frustrated, interrupted or terminated for any reason whatsoever," and covers the costs of "storage (***onboard vessel*** or otherwise)" (emphasis added). The provision *presupposes* a potential failure to complete the voyage after the Cargo was stored on the vessel for some time, precisely what occurred here.

## CONCLUSION

For the foregoing reasons, and as it will prove at trial, CITGO is entitled to a verdict in its favor and all the relief set out in its Trial Memorandum.

Dated: October 6, 2023                    Respectfully submitted,

                                          /s/ *David F. Klein*
                                          David F. Klein
                                          Mark J. Plumer (*pro hac vice*)
                                          Richard Donoghue
                                          John Chamberlain
                                          Jeffrey W. Mikoni (*pro hac vice*)
                                          david.klein@pillsburylaw.com
                                          mark.plumer@pillsburylaw.com
                                          john.chamberlain@pillsburylaw.com
                                          jeffrey.mikoni@pillsburylaw.com
                                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                                          1200 17th Street NW
                                          Washington, DC 20036
                                          (202) 663-8000

                                          *Counsel for CITGO Petroleum Corporation*